IIT, an International Investment Trust, et al., Plaintiffs-Appellees-Cross-Appellants,

v.

VENCAP, LTD., et al., Defendants-Appellants-Cross-Appellees,

and

Walter Blackman et al., Defendants.

Nos. 704, 705 and 865, Dockets 74–1969, 74–2366 and 74–2341.

United States Court of Appeals, Second Circuit.

Argued March 26, 1975.

Decided April 28, 1975.

Eugene R. Anderson, New York City (Richard W. Collins, Neal J. Morse, Leon B. Kellner, and Anderson, Russell, Kill & Olick, New York City, of counsel), for plaintiffs-appellees-cross-appellants.

Gerald E. Paley, New York City (Paley & Miller, New York City, of counsel), for defendants-appellants-cross-appellees Vencap, Ltd., Intervent, Inc., and Intercapital, N. V.

Arthur A. Munisteri, New York City, for defendant-appellant-cross-appellee Richard C. Pistell.

Peter K. Leisure, New York City (John E. Sprizzo, Robert S. Lipton, John F. Egan, and Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel), for defendants-appellants-cross-appellees Charles E. Murphy, Jr., David Taylor and Havens, Wandless, Stitt & Tighe.

Securities & Exchange Commission, Washington, D. C. (David Ferber, Charles E. H. Luedde, and David K. Ginn, Washington, D. C.), amicus curiae.

Before FRIENDLY, MULLIGAN and TIMBERS, Circuit Judges.

FRIENDLY, Circuit Judge:

This action, for fraud, conversion, and corporate waste, was brought on June 10, 1974 in the District Court for the Southern District of New York by IIT, an international investment trust organized under the laws of Luxembourg and currently in the process of liquidation there,[1] and three citizens of that country who have been appointed by the District Court of Luxembourg as its liquidators, Order of Liquidation of IIT (D.C.Lux. 1st Sec., Jan. 28, 1974). The action is another product of the troubled existence of Investors Overseas Services (IOS). It presents still further variations on the recurring theme of the ex-

---

1. The complaint characterizes IIT as "an International Investment Trust organized under the laws of the Grand Duchy of Luxembourg". The district court's opinion says it is an open-ended mutual fund. We shall assume it resembles an American business trust with the certificate holders having much the same relationship to those holding title to its property as the shareholders of an incorporated mutual fund would have to the corporation.

tent to which the federal securities laws apply to transnational transactions, with which we have dealt in Bersch v. Drexel Firestone, Inc., 2 Cir., 519 F.2d 974, this day decided.

On the same day that the complaint was filed, the plaintiffs moved for a preliminary injunction, the appointment of a receiver, and for a temporary restraining order. After reviewing the motion papers and hearing brief argument by counsel, the district court entered a temporary restraining order, subsequently modified in respects not relevant to this appeal, enjoining certain of the defendants from utilizing or exercising any control over the assets of IIT or the defendant corporations in which IIT held an investment interest. Commencing on June 14 the district court held six days of hearings on plaintiffs' application for the preliminary injunction and the appointment of a receiver. These resulted in a record of 774 pages of transcript and over 120 exhibits, filling in excess of 3,680 pages, including about 967 pages of testimony recorded at other judicial and administrative proceedings and in depositions relating thereto, concerning other aspects of the now fallen IOS empire and the activities of those who controlled it. Despite this prodigious undertaking, the court's findings, required by Fed.R. Civ.P. 52(a), are not sufficient to enable us to make a definitive determination on the issue of subject matter jurisdiction or, if that bridge can be crossed, on the question whether plaintiffs showed a sufficient probability of success on the merits to warrant its order issuing a temporary injunction and appointing a receiver, from which defendants appeal.

## I. *The Facts.*

The leading player in the drama here unfolded is the defendant Richard C. Pis-

tell, whom the court found to be "a United States citizen who resides in the Bahamas."[2] Early in 1972, Pistell, who at that time had over 24 years of experience in the investment and finance business, first as a financial analyst and then as an investment banker with his own firm, met with Stanley Graze, a United States citizen resident in London, president of International Capital Investments (Sterling) Ltd., also known as Incap, an English corporation, which had overall responsibility for managing various IOS mutual funds, including IIT, in Nassau, Bahamas, in connection with the sale of a resort named Paradise Island by Resorts International, Ltd. to the IOS Group. Over a period of several weeks, in a number of meetings, all but one of which apparently were conducted outside the United States,[3] they discussed financial subjects in which they each had a strong interest, including "the philosophy of money markets, the perils of the stock market and particularly whether monetary parity could be maintained." During one of Pistell's visits to London in the early part of 1972, Graze told Pistell that he intended to put the funds managed by Incap in a more liquid position if the Dow Jones Industrial Average fell below 1040 and solicited Pistell's views. Pistell presciently took a bearish attitude and advised that if he were in Graze's position, he would invest in Japanese yen, Deutschmarks, and gold. From April through October 1972 IIT had net sales of $121,708,019 in United States securities.

During that same period Pistell, who had extensive experience in locating and financing new ventures, finalized his plans to form a venture capital firm, an idea which he claims to have had at the end of 1971. One of the individuals with whom he discussed his plan and certain

---

**2.** Arguing from an alleged statement by Pistell that New York is home, plaintiffs dispute the finding of Bahamian residence. It is clear in any event that Pistell was often in the United States during the fall of 1972 and the winter of 1973. While in New York he occupied an apartment that he characterized as his wife's.

**3.** In March 1972 Pistell met Graze at the headquarters of the International Controls Corporation in Fairfield, New Jersey, to discuss a loan by Fund of Funds, Ltd., one of IOS's other so-called dollar funds, to Conservative Capital, an enterprise under the control of Pistell and one of his associates. See p. 1010 *infra.*

of the ventures in which the proposed firm likely would invest, was Graze, who, according to Pistell, indicated that IIT would be interested in holding an interest in such a firm.

In June 1972, Pistell, with the help of his lawyer, Charles E. Murphy, Jr., a member of the New York law firm of Havens, Wandless, Stitt and Tighe (Havens Wandless) and a Bahamian law firm, Carson, Lawson & Co. (Carson Lawson), set about to organize a venture capital firm. On July 4 Vencap Limited (Vencap) was incorporated under the laws of the Bahamas. Five thousand common shares were initially authorized, with 2,000 being issued to Pistell, and one share each to the four other incorporators, apparently at $1 per share. Pistell became chairman of the board, president, and treasurer. On July 31, 2,000 common shares were issued to Count Armoury de Reincourt, a French citizen, publisher, financial consultant, and private investor, residing in either Paris or Geneva;[4] again, the issue price was $1 per share, or $2,000.

During August 1972 Graze and Pistell, apparently in London,[5] came to an understanding in principle that IIT would invest in Vencap. Shortly thereafter, a three-page undated memorandum was prepared at Pistell's instruc-

tions. Because of the central importance of the memorandum, we shall follow Judge Stewart's example and annex a copy of that document, as well as the shareholders resolution which it incorporates by reference, as an appendix to this opinion; understanding will be facilitated if the memorandum is read at this point. It is reasonably clear that the memorandum which ultimately found its way into the hands of IIT or its attorneys—Willkie, Farr, & Gallagher of New York (Willkie Farr) and Higgs & Johnson of Nassau—was prepared in the Bahamas mainly by Vencap and/or its lawyers. However, if it was prepared by Vencap's lawyers, as seemingly it must have been at least in part, there is conflicting evidence as to which lawyer. Also the evidence is unclear as to just what was done with it. Moreover, there is testimony, which is in part contradicted, that this memorandum itself was based on a prior memorandum outlining the purposes of Vencap, which had been prepared by Murphy at the request of Pistell. Assuming this to be true, it is unclear when and where this earlier document was prepared, whether it was prepared with the expectation that portions of it would later be transmitted to potential investors, what was done with it, and to what extent, if any, the final memorandum varied in substance from this earlier document.[6] The district

---

4. De Reincourt's residence is unclear. Vencap's corporate records list his address as Geneva, Switzerland, while the three-page memorandum that was proposed by Vencap prior to the signing of the investment agreement, see App. A, states that he is a resident of Paris.

5. While the district court's opinion is silent concerning the place where this oral agreement was made, no one claims it was in the United States.

6. In April 1973, while testifying as a government witness during the preliminary injunction hearing in SEC v. Vesco, 72 Civ. 5001 (S.D.N.Y.), and in his post-hearing deposition in that same proceeding in May, 1974, Pistell stated in essence that he had requested that a lawyer at Havens, Wandless prepare a memorandum "memorializing" his discussions with IIT, that, although he was not certain, it was probably prepared by Murphy, and that he thought it

was mailed to Graze in London by his attorneys. In the hearing in this proceeding—only one month subsequent to his deposition testimony—Pistell testified that the memorandum had been requested by IIT, was "prepared" in Nassau by Carson, Lawson, and was based on an outline worked on there by him and Murphy. Murphy testified in the hearing below that he had not mailed a copy of the memorandum to Graze—indeed that he had never seen "this memorandum" until it was shown to him either on the stand or the previous night—and was fairly sure his firm had not, but that a copy had been hand delivered to IIT's counsel, Willkie Farr, in the Bahamas. Murphy testified that at an earlier date he had prepared "a memorandum at Mr. Pistell's request putting forth the general outline of purposes of the company," that in September 1972 during the course of the negotiations in the Bahamas with IIT's New York and local counsel they had requested a document "[t]o

court did not resolve these conflicts or uncertainties.

Willkie Farr in New York proceeded to draft an agreement for IIT's subscription to the 30,000 redeemable preference shares at $100 per share described in the memorandum, these to be accompanied by warrants to purchase an additional 30,000 such shares exercisable at the same price within three years of the closing. Defendants contend, relying on the uncontradicted testimony of a number of witnesses, that the essential terms and conditions of the preference shares had been prepared "jointly in Nassau, Bahamas, by Bahamian counsel and Willkie, Farr . . . ." Although plaintiffs state that "[t]he terms and conditions of the preference stock were formulated, drafted and negotiated by Taylor in New York after Pistell and Graze agreed on broad outlines", the portions of the record which they cite in support of that conclusion indicate only that the Havens, Wandless firm reviewed the agreement, particularly the provisions relating to the preferred shares, and did exchange drafts with Willkie Farr in New York. David Taylor, a member of the Havens, Wandless firm, who admitted to having authored in New York a draft of the redemption

provision of the preference shares, see App. A, Shareholders' Resolution of August 31, 1974, ¶ (5), testified that "the entire contract was negotiated and the essential terms all determined and arranged in the Bahamas before I even saw the document." Despite this testimony it is not entirely clear whether the substance of the drafts exchanged in New York related only to certain technical aspects of the preference share terms or to broader matters. Some light could surely have been furnished by a lawyer from Willkie Farr but none was called to testify. Again, the district court's findings do not greatly clarify things, its only statement with regard to these events being that "[d]uring September 1972, Willkie Farr & Gallagher, a law firm doing business in New York City, prepared an agreement with respect to the IIT investment in Vencap which was presented to Pistell's lawyers for review."

The final agreement, a document of two single-spaced typewritten pages, is simplicity itself. Beyond incorporating by reference the August 31, 1972 resolution of the Vencap shareholders, see App. A, defining the terms of the preference shares which apparently had been annexed to the three-page memorandum,[7] and setting forth the form

memorialize the transaction", that he had suggested that the memorandum which he had earlier prepared at Pistell's request be supplied, and that this was in fact done to the extent that "portions" of it were incorporated in the final three page memorandum which he "believe[d] was typed or prepared on Vencap stationary in the offices of Carson, Lawson."

7. Our inability to ascertain exactly what was done—by whom, when, and where—is nowhere more evident than with respect to the question whether there were any changes in the terms of the preference shares as stated in the final agreement as compared with those contained in the shareholder resolution of August 31 that was attached to the three page memorandum. From a search of the record, we have located a copy of a two page document with the heading "Vencap Limited", which, over the attestation of an Assistant Secretary, states that on August 31, 1972 the shareholders unanimously passed an "Ordinary Resolution", which is then set out in full.

Exhibit Vol. III, 1184A–85A. This document, which explicates the terms of the preference shares, on its face appears to be the "August 31" shareholder resolution referred to in the three page memorandum.

The final agreement, dated September 29, 1972, states in paragraph (3)(d) that "the shareholders of the Company have adopted resolutions substantially in the form annexed hereto as Exhibit A establishing the rights of the holders of the Redeemable Preference Shares." Exhibit Vol. IV, 1605A–06A. Turning to Exhibit A, *id.* 1607A–09A, which was signed by Vencap's officers and directors, we find that it in essence is a slightly more elaborate version of the shareholder resolution discussed above, the only differences being minor, such a statement to the effect that de Reincourt had filed a proxy authorizing Pistell to represent him.

Despite their general vigorous disputes over who drafted and negotiated what, and where, the parties apparently agree, however, that

of warrant, the provisions were usual boiler plate.

The agreement was dated September 29, 1972, and the closing was set for October 6, the place being unnamed. It was signed in the Bahamas by "I.I.T. Management Company, S.A., on behalf of IIT, an International Investment Trust" by Milton Meissner, who was president of the Management Company and also of IOS, Ltd., the daddy or granddaddy of them all. It was accepted by Vencap; the signature is illegible but we are told it is Pistell's. The closing occurred in the Bahamas on October 9. Although the district court found that the funds were transferred by American National Bank and Trust Company of New Jersey (ANBT), where IIT had a large balance as a result of the security sales it had been making since April, to the Bahamas Commonwealth Bank (BCB), defendants say this is clearly erroneous. We believe it is, and on a

basis that shows the relative unimportance of this bitterly contested point. Apparently IIT had initially intended to have ANBT transmit the funds but then changed its mind and had the funds transferred directly to BCB by the Overseas Development Bank of Luxembourg (ODB).[8]

The district court also recited several rather peculiar transactions that took place in 1973, without indicating just what their legal significance was considered to be.

As to the first of these, the court appears to have been plainly wrong on the facts. In January, 1973 de Reincourt, having become alarmed by adverse publicity about Vencap's connections with Robert L. Vesco, transferred his shares to Pistell.[9] These shares were reissued to defendant Walter Blackman, an American citizen resident in the Bahamas, in May, 1973. He became a di-

some negotiations did occur concerning the agreement, or at least that drafts of the agreement were exchanged, in New York. While averring that the essential terms and conditions of the agreement had been determined in Nassau prior to his ever seeing the draft agreements, Taylor did admit to having worked on a draft of the terms of the preference shares, specifically paragraph (5) relating to the redemption provisions. Among the many exhibits submitted is a single page copy of a typed paragraph with the heading "Draft/DGT September 20, 1972." and the designation "(5)" appearing directly before the first sentence. The paragraph is almost a verbatim exposition of what was to become paragraph (5) of the terms of the preference shares, as set out in Exhibit A to the final agreement.

Precisely how the shareholder resolution authorizing the issuance of the preference shares, dated and certified as occurring on August 31, 1972, could contain a provision which is almost the exact duplicate—in fact, which appears to be a subsequent version—of a draft dated some three weeks later, is a question we are unable to answer. We can only note again that no finding was made by the district court as to when the three page memorandum was in fact prepared and transmitted—defendant Murphy testified that it was prepared during the last week of September. One possibility which immediately suggests itself as a result of Taylor's admission is that the preparation and transmission of the memorandum did not

occur until sometime after September 20, the date of Taylor's draft, yet before the signing of the final agreement of September 29, and that the shareholders resolution was backdated. If this were true, it would bolster defendants' contention, see notes 6 *supra* & 19 *infra*, that the memorandum was not a "selling document" but was merely a "memorialization" of their discussions requested by IIT. Alternatively, it may support one of plaintiffs' theories of fraud, namely, that the entire transaction was a conspiracy by the officers of IIT and Pistell to allow Pistell to acquire a portion of IIT's assets for his personal use. It is impossible to decide what inferences are most reasonable, as they bear both on subject matter jurisdiction and on the merits, until the facts are found.

8. Confusion with respect to the resolution of this question has arisen from the fact that ODB also had an account at ANBT and that even when a fund transfer was made directly from ODB to a third party a bookkeeping entry would be made in ANBT's records to reflect the change in ODB's overall asset position.

9. Although the agreement between Pistell and de Reincourt transferring the shares is dated January 17, 1973, the share register of the corporation indicates that de Reincourt ceased to be a member on May 21, 1973, the same date which is listed for their reissuance to defendant Blackman.

rector, executive vice president, and secretary of Vencap. In its findings the court stated that at some unnamed date Pistell and Blackman each agreed to sell their interest in Vencap to the other for $5,000 in the event of death or termination of employment. In fact the agreement, signed May 22, 1973, the day after Blackman became a shareholder, is between Vencap and any "holder" (as therein defined) who subscribed to the agreement; provided for sale to Vencap's designee; and was signed only by Blackman. The court also found that in March, 1973 Pistell (as well as Blackman) agreed to sell his interest in Vencap at cost to Norman Le Blanc, executive vice president of IOS, Ltd., if the latter requested. In fact this was a proposal made by Pistell by letter dated March 27 and was not joined by Blackman—which, of course, he could not have done since he apparently was not yet a Vencap shareholder[10]—, was made in connection with a proposed general settlement relating to various IOS funds and claimants against them, and was later withdrawn.

More important, at a time unspecified by the court, which turns out to be January, 1973, Pistell caused Vencap to initiate a series of transactions that resulted in funneling substantial amounts of Vencap's funds into his own hands. Although we can be relatively certain of the net effect of these transactions, we are again confronted with conflicting evidence as to precisely how they were completed. The plaintiffs allege, and the district court found, that Pistell caused Vencap to deposit $600,000 in the Handelskredit-Bank A.G., a private Swiss bank; and that Pistell then caused Intercapital N.V., a Netherlands Antilles corporation, which apparently had no assets and had its office at 99 Park Avenue, New York City, the office of Havens, Wandless, and whose only shareholders were Pistell and Blackman, each holding 50% of its common shares, to borrow $590,000 from the bank. To secure the loan Vencap pledged what the court characterized as its "$600,000 certificate of deposit" as collateral; as further collateral for the loan Pistell pledged to the bank his interest in Pamaikai Oil Company which was later merged into Flag-Redfern Oil Company. These findings do find some support in the record. One of the plaintiffs' exhibits is a telex to Taylor dated January 9, 1973, which they allege is from the Handelskredit-Bank, acknowledging the receipt of a $600,000 deposit by Vencap. Moreover, in deposition testimony rendered by Pistell in another proceeding he stated that Vencap had made time deposits at the bank which he characterized as certificates of deposit and that the bank held these, as well as certain stock which he owned, as security for certain loans, one of which was "[f]ive ninety [$590,000] and ten thousand cash."[11] Finally, on January 19, 1973 the directors of Vencap authorized certain of

---

10. Pistell's letter to Le Blanc states that he is making the sale of shares offer "on behalf of myself and other Vencap Limited Stockholders." The court's error may have been induced by Pistell's testimony, in response to questioning by plaintiffs' counsel as to who the other stockholder was as of the date of the letter, "I believe Walter Blackman." However, this statement appears to be clearly wrong. Only a few moments before, the following dialogue occurred between plaintiffs' attorney and Pistell:

Q. When did you enter into that agreement [the agreement between Vencap and Blackman restricting his ability to transfer Vencap stock] with Mr. Blackman?
A. If you could help me out. The date of this is May 22, 1973.

Q. And that is the day after the stockholders meeting at which Blackman became a stockholder and entered into various employment contracts, is that correct?
A. That is correct, sir.
Exhibit Vol. II, pp. 808A–09A. See also note 9 supra.

11. In his deposition testimony in SEC v. Vesco, supra, Pistell stated that these assets had been pledged as security for two loans by Handelskredit-Bank to Intercapital. The other loan was stated to have been for $700,000. Neither the district court nor the parties on appeal have referred to this second alleged loan.

its officers, including Pistell and Taylor, who was then Assistant Secretary, to execute any promissory notes or other documents which might be required by Handelskredit-Bank, or any party designated by it "in connection with a loan to be made by the bank to Intercapital N.V. in an amount which does not exceed the amount of funds of the Company currently on deposit with the Bank."

There is, however, substantial evidence in the record which supports a slightly different view of how this phase of the funneling of funds to Pistell was accomplished. While this difference likely would not prove decisive to a resolution of plaintiffs' claims, we emphasize the importance of ascertaining as precisely as possible the exact means by which an alleged fraud has been accomplished, since, as will be discussed more fully below, both the question of jurisdiction and the availability of a remedy may turn upon this. Contained in the record is a copy of a document with the heading "Trust-Agreement" that was entered into by Vencap, being signed by Pistell, and Handelskredit-Bank A.G., dated February 1, 1973. The agreement provided that the depositor Vencap would place $590,000 in a "trust-account . . . in its name . . . with instructions to grant a loan in the Bank's name, but for the account and at the exclusive risk and peril of the depositor" to Intercapital N.V. The loan had a two year maturity and carried an interest rate of 8.5%; interest was payable annually. The

trust agreement provided that the interest received would be credited to Vencap's account, after deduction of an annual trusteeship-commission to the bank of 1.5% of the original principal of the loan. This commission was payable whether or not interest was in fact paid by Intercapital.

Ignoring, at least for present purposes, these and other more minor differences in the apparent structure of the loan agreement with the Handelskredit-Bank,[12] the $590,000 was then borrowed by Pistell from Intercapital; the loan carried an interest rate of 9.5%. He used these funds to pay personal federal and state income taxes (the former of which was secured by a lien against all his property) and loans from Chemical Bank, Bowery Savings Bank, and Franklin National Bank, and to satisfy a judgment against him. The only benefit to Vencap from all this, apart from the 7% net interest payable by Intercapital, likely no more than the return which it might have obtained by investing this amount directly in certificates of deposit offered by any number of foreign banks, was the grant by Pistell to it of an option to purchase 10% of his interest in Flag-Redfern.[13]

This loan transaction was followed in March, 1973 by an employment agreement whereby Pistell was to receive a salary of $60,000 per annum, 15% "off the top" of any Vencap profits, and a home in the Bahamas costing no more than $150,000, including renovation.[14]

---

**12.** From documents contained in the record it appears that on February 1, 1970 agreements were executed whereby Pistell pledged his 66,-256 shares of Pomaikai Oil Corporation to Intercapital, which in turn pledged the shares to the Handelskredit-Bank as security for repayment of the $590,000 loan. Defendants contend that this complicated means of effectuating what in final effect was a loan by Vencap to Pistell apparently was the result of tax considerations; namely, there was no withholding tax on interest paid to Intercapital—a Netherlands Antilles corporation—because of tax treaties, while interest payable directly to Vencap by Pistell would have been subject to withholding, there being no such tax treaty with the Bahamas.

**13.** In December 1973 Pistell was the beneficiary of a further $55,000 personal loan. On this occasion the borrowing was from Intervent, a Delaware corporation, also having its office at 99 Park Avenue, which was wholly-owned by Vencap. The collateral for this loan was an agreement to grant a mortgage on his Bahamas residence, which earlier had been provided him by Vencap, if the loan was not repaid by December 31.

**14.** The opinion of the district court also recited that Vencap had paid more than $10,000 as alimony payments to Pistell's ex-wife and $2,000 for the telephone bills of his present wife. Pistell claims these are included in a rather startling list of other payments alleged-

The court further stated that "Vencap has been used to aid in the financing of other companies in which defendants have or had an interest." The principal instance given in the opinion was a transaction wherein Vencap loaned Chibex, a Canadian gold mine corporation, $155,000 and received options on 75,000 shares at $1.00 per share and another 75,000 shares at $1.50 per share, but submitted to a put by Fund of Funds, an IOS dollar fund, whereby upon three days' notice Vencap could be required to purchase 500,000 additional shares at $1.00 per share. Chibex was said to have been controlled by a company bearing the rather misleading name of Conservative Capital Limited, which in turn was controlled by Pistell and Blackman, see note 2 *supra*. In addition to claiming that only $75,000 had been loaned, for which Vencap received an option to purchase 75,000 shares at $1.00 per share (an additional $75,000 loan and the $1.50 option being at Vencap's election),[15] Pistell contends that the transaction was advantageous, as evidenced by the fact that Chibex shares were selling at $1.78 per share until, as claimed, due to the publicity incident to the bringing of this action, the price fell to $1.18. The district court made no findings with respect to these contentions.[16]

This court has no desire to and does not assume the role of a defender of Mr. Pistell. On the other hand, we cannot look with favor on a series of "findings" which simply adopt plaintiffs' accusations and leave Pistell's explanations un-

ly made for his account. He says many of the items listed as payments to him were for corporate account and that the court's figure of $356,640.62 for compensation through April 30, 1974, was inflated by the inclusion of the "one-shot" payment of $162,546.05 for the purchase and furnishing of his Bahamas home, allegedly provided to compensate for a loss on the sale of his apartment in New York which he gave up to move to the Bahamas, and does not take account of $100,000 of his own property which he had transferred to Vencap, apparently in part because of the federal tax lien. The opinion says that this was not originally intended to be a "loan" to Vencap but became so only in May 1973 when Blackman secured approval of the directors that it be so considered. Since the court did not dispute that the $100,000 was Pistell's property and Pistell received no securities for it, we do not understand why it was not an open account advance, even if, as the court found, it was transferred "for startup costs."

15. Pistell's contentions regarding the substance of loan-option transactions find substantial support in the record. One of plaintiffs' exhibits contains copies of both the loan and the option agreement. The terms of the latter are precisely as defendant has contended. Moreover, although the district court is correct in its finding that Chibex was loaned $155,000 by Vencap, acting through its wholly owned subsidiary Intercapital, $80,000 of this total was apparently an unrelated "two or three or four day loan" which according to Taylor has in fact been repaid.

16. Plaintiffs' brief refers, although the court does not, to another loan by Vencap to Chibex of $400,000, and to an investment of $672,000 in Lincoln American Corporation, a company whose shares are listed on the American Stock Exchange and of which Pistell is Chairman of the Executive Committee. At the time of the hearing there was an unrealized loss of approximately $340,000 on this investment.

The court did refer to an investment of $600,000 in Out Island Airways Limited of which Murphy was a director and part owner. Defendants admit that in late 1972 Vencap acquired a $662,000 9% convertible secured debenture from the airline. However, since Out Island was the airline referred to in the memorandum and, according to the uncontradicted testimony of Murphy and Pistell, the investment was recouped with interest and a fee—either in the form of stock or cash—worth some $62,000 when the Bahamas government decided to take over the airline, we fail to see the significance of this. The court further stated:

> Vencap deals currently in progress include: Vencap is 50% owner of Sangin, a corporation which is attempting to import Turkish wine into the United States, and Vencap is financing the spade work for a potential concession in the jungles of the Cameroons for diamonds, sapphires and gold.

The purpose of this reference also is unclear. While such ventures are not for Auntie Mame, no one expected Vencap to invest in government bonds and there is no intimation of self-dealing. Indeed, the court's approval of its receiver's permitting Vencap to invest $40,000 in the Cameroons venture is the subject of plaintiffs' cross-appeal.

mentioned and undecided.[17] Nor are we able to decide these disputed factual issues for the first time on appeal.

The district court concluded, on grounds hereafter discussed, that it had subject matter jurisdiction, that plaintiffs had demonstrated a probability of succeeding on the merits, that plaintiffs would be irreparably harmed if interlocutory relief were not granted, and that the balance of hardship was in their favor. Accordingly, it enjoined Vencap, Intervent,[18] Intercapital and Pistell from dealing with the property of the three corporations or of IIT and appointed a receiver pending final hearing.

## II. *The Alleged Fraud.*

Normally we would proceed at this point to the issue of subject matter jurisdiction since, if that did not exist, it is immaterial whether or not the plaintiffs have shown a sufficient probability of success on the merits to warrant the grant of interlocutory relief. But here the two issues are interrelated, as we shall explain at greater length below. It suffices to say at this point that insofar as the court relied on the facts that Pistell "spends much of his business time in New York City purportedly on Vencap's business" and "conducted the business of Vencap in the Southern District during the material times in the allegations", such reliance would not assist on subject matter jurisdiction if these references are to activities subsequent to the closing, as they seem to be, and if the fraud had been completed then.

(1) With respect to the merits, the court placed primary emphasis on what it regarded as false and misleading statements in the undated three page memorandum, see App. A.[19] The court focused on the statements that "risk deserves a high return" and that Vencap was contemplating "a broad investment base designed to offer . . . short and long term returns which will inure primarily to the benefit of the preferential capital investors." If that were the end of the matter, the misleading character of these statements would be evident. The "preferential capital investors" of $3,000,000 would receive only a 6% non-cumulative dividend, if earned and declared by directors elected solely by the common stockholders, and a further dividend of a third of the remaining profits, if and when so declared, whereas the common stockholders, with a $4,000 investment, would have the benefit of two-thirds of such earnings.[20] But the memorandum went on to describe exactly what the "preferential capital investors" would get, even to the point of annexing a copy of the Vencap shareholder resolution defining the rights and privileges of the preferred stock. Even this might not be a sufficient answer if the memorandum had been addressed to the public. Instead it was addressed to a highly sophisticated investor, advised by experienced counsel, and the testimony points to a conclusion that the latter

---

17. The court was doubtless handicapped by the practice of plaintiffs' counsel, repeated on appeal, of assembling a mass of accusations, liberally larded with references to Vesco, without analysis of their legal significance.

18. See note 13 *supra.*

19. Defendants argue with considerable plausibility that, despite what form might indicate, the memorandum was not an inducement to IIT to enter into an agreement but a "memorialization" of one already reached. The chief support for this is the uncontradicted testimony that the memorandum was prepared at some point in September during the course of the negotiations in the Bahamas, well after the

parties had decided in principle to enter into the transaction, see note 6 *supra,* the doubt whether the memorandum was ever sent to London or was simply deposited in the files of IIT's attorneys, and the absence of any evidence of communications between the principals of Vencap and IIT in the interval between the undated (but certainly post August 31 and very likely post September 20) memorandum and the agreement of September 29. The court found that "the facts . . . do not support such a contention," but did not explain why in a fashion that we can clearly understand.

20. We shall go into this further in part (2) below.

had participated to some extent in the drafting of the preferred stock provisions. Beyond being exceedingly weak on the merits, this ground is equally weak with respect to subject matter jurisdiction as we shall see.

(2) A ground closely allied to that just considered would be that while there was no untrue statement or omission in regard to the position the "preferential" investors would have, so as to bring the transaction within Rule 10b–5(b), the preferred stock was by its very nature a "device, scheme or artifice to defraud" within Rule 10b–5(a). To say that Vencap was highly leveraged would be a gross understatement. Plaintiffs point out that the preferred stockholders, who were providing 99.9% of the capital, received no vote at stockholders' meetings, no representation on the board of directors, and no current income unless this was earned and declared. Even if Vencap succeeded say to the point of earning $480,000 a year, preferred stockholders would be entitled to only $280,000 on their $3,000,000 investment and would receive this only if the directors, elected by the common stockholders who had put up $4,000 chose to declare dividends in that amount. The position was made even worse by the noncumulative feature and the provision that the preferred stock was redeemable at par and accrued dividends at the rate of 6% per annum at any time. This freedom of redemption gave the common stockholders an incentive not to declare dividends, at least beyond 6%, but rather to allow earnings to accumulate and then to redeem at par plus 6% dividends. Putting the case in its best light for the defendants, IIT in practical effect was hiring Pistell as a money manager on a basis where, in addition to liberal compensation, he and the other owner of the common stock would receive two thirds of the profits after 6% interest, the latter payable only if earned; at worst he might end up by simply handing back the money with 6% interest if earned. The claim would be that the use of such a "security" was a *per se* violation of Rule 10b–5(b) if offered to unsophisticated investors or if, as here, a sophisticated purchaser was acting in a fiduciary capacity.

Such a theory, however, encounters several difficulties. One is that the district court did not proceed on any such ground and therefore did not make the findings that would be needed. Another is that we have been cited no authority for it. Curiously almost all the proliferation of Rule 10b–5 has been based on section (b) and sections (a) and (c) have received relatively little specific attention.[21] We see no reason to believe that Rule 10b–5 was intended to discourage an issuer from driving the best bargain possible, at least where both sides are sophisticated investors and, as assumed for purposes of this portion of the opinion, the terms of the transaction have been clearly specified. On the facts here any conclusion that the transaction might violate Rule 10b–5(a) would thus have to rest on proof that IIT was merely acting as investment adviser for large numbers of unsophisticated investors, which it clearly was, and that Vencap knew or should have known that IIT was not properly discharging its duties. We hesitate to plough new fields for the application of Rule 10b–5 when this theory stands no better with regard to subject matter jurisdiction than the ground first considered.

(3) A third ground, which appears to have been plaintiffs' main reliance in the district court, was that the transaction was a conspiracy between IIT's management and Pistell to defraud the IIT

---

21. A notable exception is Judge Hays' opinion on the rehearing en banc in Schoenbaum v. Firstbrook, 405 F.2d 215, 220 (2 Cir. 1968) (en banc), cert. denied sub nom. Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). See also SEC v. Kelly Andrews & Bradley, Inc., 341 F.Supp. 1201 (S.D.N.Y.1972). However, in Popkin v. Bishop, 464 F.2d 714, 719 (2 Cir. 1972), this court declined to follow Judge Hays' lead on the facts there presented.

fundholders. This would have the advantage, from plaintiffs' standpoint, of removing the roadblock of the knowledge of IIT's management and counsel and of at least getting close to the holding on the merits in Schoenbaum v. Firstbrook, *supra*, 405 F.2d 215, 220 (2 Cir. 1968) (en banc), cert. denied, sub nom. Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).[22] See generally 1 Bromberg, Securities Law: Fraud, SEC Rule 10b–5 84.66–.71 (Supp.1972–73) and cases cited therein; Note, The Controlling Influence Standard in Rule 10b–5 Corporate Mismanagement Cases, 86 Harv.L.Rev. 1007 (1973). But it would seemingly involve a finding that counsel for both parties allowed the conspiracy to go on when they knew or should have known of its existence. In any event the district judge found there was insufficient evidence to support this theory to serve as a basis for the issuance of a preliminary injunction, and we cannot say he was clearly wrong on the evidence that was before him.

(4) A fourth ground would be that Vencap represented not merely implicitly but explicitly[23] that it would be operated solely as a *bona fide* venture capital enterprise whereas in truth and fact it was intended, at least in substantial part, to be used for Pistell's private benefit. This escapes the problem of the involvement of counsel for both companies in working out the terms since counsel would not necessarily have known, or had a duty to inquire and ascertain, what Pistell's real intentions were. Such a theory would also make relevant the district court's recitation of the conduct of Vencap's affairs after the closing. The most obvious building block would be the use of $600,000 of Vencap's funds as collateral to obtain $590,000 for Pis-

tell's personal use. While Pistell insists that his Flag-Redfern stock is adequate collateral, the use of one-fifth of IIT's investment for a personal loan to him is, to say the least, unusual; even if Vencap had no other use for the money at the time, a venture capital corporation would not wish to immobilize 20% of its assets in an investment for the benefit of an officer whence it could derive only a modest rate of interest. On the other hand Pistell testified that Graze knew about his tax problems before IIT invested in Vencap and that he told Graze about the loan before making it. The district court made no findings on this subject. We have mentioned other items that might support the theory here under discussion but there is a similar lack of response to Pistell's explanations. Indeed, as we read the court's opinion, it concluded there was the same lack of sufficient evidence to support this theory as for the conspiracy theory.

(5) A fifth theory would combine elements of the two last considered. This would be to treat the IIT liquidators as suing as a stockholder of Vencap for injury done to it. However, it is hard to find this theory alleged in the complaint (which, of course, could be readily amended) or in the district court's opinion. Admittedly this theory would encounter the "mismanagement exception" to Rule 10b–5. But the contours of this have been receding, see 6 Loss, Securities Regulation 3632–45 (1969); 1 Bromberg, *supra*, 84.41–46 (Supp.1972–73); Jennings & Marsh, Securities Regulation, Cases and Materials 1223–30 (3d ed. 1972); and despite the need, under Birnbaum v. Newport Steel Corp., 193 F.2d 461, 464 (2 Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), to find a connection with the purchase or sale of a security, are likely to

---

**22.** Adoption of such a theory would also do much to explain certain peculiarities in the facts, which otherwise appear to be inexplicable. See note 7 *supra.*

**23.** We refer to such passages in the memorandum as "a sophisticated investment program

with respect to growth opportunities throughout the world," "the sound investment of preferential capital utilizing management's contacts and experience in growth opportunities," and "a broad investment base".

recede still further under the continuing impact of Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Although the record in that case indicated that a majority of Manhattan's board was duped, see 430 F.2d at 360, 404 U.S. at 8 n. 1, 92 S.Ct. 165, nothing in the opinion affords the slightest indication that the Court would have reached a different result if Manhattan's entire board had happily concurred in the fraud upon it. Even if IIT's initial purchase of Vencap shares would not trigger application of Rule 10b–5, which prior to *Superintendent of Insurance* we

should hardly have thought it would unless it was itself a fraud,[24] the use of Vencap's funds to purchase the Chibex note and option and of the Lincoln American shares, if done for Pistell's benefit,[25] would seem to suffice under the *Superintendent of Insurance* decision.[26] See, as to the present status of *Birnbaum*, 1 *Bromberg, supra*, at 84.31– 32 and 87–88.10.

It should go without saying that we are not passing on the merits of an action based on the theory of a derivative suit here considered; we say only that the present or a supplemented record might support it.[27]

---

**24.** It is not clear that the *Superintendent of Insurance* case has worked any change in this respect, since the Court declined to decide if Bankers Life's sale of the Manhattan stock to Begole would bring the transaction under Rule 10b–5, 404 U.S. at 13, 92 S.Ct. 165.

**25.** Given our uncertainty as to the precise nature of the transactions which occurred between Pistell, Handelskredit-Bank, Vencap and *its affiliates, see* pp. 3200–3201 *supra*, we are unwilling to venture a conclusion whether any of the interests given or received by parties to those transactions constituted a "security" so as to make the anti-fraud provisions of the Securities Acts potentially applicable. At this stage of the proceeding we will say only that it appears most doubtful that any of the interests exchanged could fairly be so characterized. The question whether a particular interest constitutes a security has arisen in many cases, see, e. g., Sanders v. John Nuveen & Co., 463 F.2d 1075 (7 Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972) (short term promissory notes issued to public); Lino v. City Investing Co., 487 F.2d 689, 693–96 (3 Cir. 1973) (promissory notes given in private transaction); Movielab, Inc. v. Berkey Photo, Inc., 321 F.Supp. 806 (S.D.N.Y.1970) (promissory note), aff'd 452 F.2d 662 (2 Cir. 1971); MacAndrews & Forbes Co. v. American Barmag Corp., 339 F.Supp. 1401 (D.S.C.1972) (bills of exchange); McClure v. First Nat'l Bank, 352 F.Supp. 454 (N.D.Tex.1973) (note and trust deed), aff'd 497 F.2d 490 (5 Cir. 1974), and has been the subject of substantial commentary, see, e. g., Katz & Lipton, "Notes" Are not Always Securities, 30 Bus.Law 763 (1975); Katz & Lipton, "Notes" Are (Are not?) Always Securities—A Review, 29 Bus.Law 861–66 (1974); Comment, Commercial Notes and Definition of 'Security' Under Securities Exchange Act of 1934: A Note Is A Note?, 52 Neb.L.Rev. 478 (1973); Comment, Bills of Exchange Under the Securities Laws: MacAndrews &

Forbes Co. v. American Barmag Corp., 121 Penn.L.Rev. 921 (1973); Comment, Securities Regulation—Commercial Paper—Promissory Notes with Maturity Not Exceeding Nine Months but Offered to Public as Investment Are "Securities" Within Section 3(a)(10) of the 1934 Act, 26 Vand.L.Rev. 874 (1973). Resolution of this question can be postponed until after the relevant facts have been more fully developed.

**26.** If Representative Rayburn would be surprised to learn what he had wrought with respect to misuse of corporate assets in the sale or purchase of securities, as we think he would be, this would not be the first occasion where statutory language has had a generative power going beyond what was in the forefront of the minds of its sponsors. Compare Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). If one asks why a court should recognize a federal claim when new owners loot a company of $5,000,-000 of Treasury bonds, as in *Superintendent of Insurance*, but not if they steal the same value in gold bars, the answer—apart from the one, sufficient for an inferior federal court, that the Supreme Court has so decided—must be that, when Congress has legislated comprehensively with respect to securities frauds, there will inevitably be a borderland where the policy for federal regulation is less clear than at the central core, and there will also be a difficulty in seeing what sound purpose is served by having the statute or rule apply when the fraud lies in the misappropriation of a corporation's securities but not of other property. A line must be drawn somewhere, and the Supreme Court, as we read its opinion, has pushed the perimeters rather far when securities are involved.

**27.** We have not mentioned one ground at which plaintiffs at least hint, namely, that defendants wrongfully caused IIT to make net

## III. Subject Matter Jurisdiction.

The district court concluded that it had subject matter jurisdiction under § 22(a) of the Securities Act of 1933; § 27 of the Securities Exchange Act of 1934; and 28 U.S.C. § 1337. Evidently borrowing from the complaint the court thought it probable that such jurisdiction was also founded on diversity of citizenship under 28 U.S.C. § 1332; under 28 U.S.C. § 1350 hereafter discussed, McKinney's Consol.Laws; under § 302 of the New York Civil Practice Law and Rules; and on the doctrine of pendent jurisdiction. We think it plain that the only possible bases for subject matter jurisdiction are the cited sections of the 1933 and 1934 acts.

While 28 U.S.C. § 1337, conferring jurisdiction over actions arising under an Act of Congress regulating commerce or protecting trade and commerce against restraint and monopolies, is important when the Act of Congress does not have its own jurisdiction conferring provision, see Murphy v. Colonial Federal Savings and Loan Ass'n, 388 F.2d 609, 614–15 (2 Cir. 1967), it adds nothing to one that does. Diversity jurisdiction under 28 U.S.C. § 1332 is defeated by the presence of aliens both as plaintiffs and as defendants, 1 Moore, Federal Practice ¶ 0.75 at 709.6–.7 (1974), and cases there cited. The reference to § 302 of NYCPLR must have been inadvertent. Pendent jurisdiction can be relied upon only when there is a claim conferring federal jurisdiction that will survive a motion to dismiss. United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

This leaves 28 U.S.C. § 1350 which confers jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States". This old but little used section is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act, § 9, 1 Stat. 73, 77 (1789), no one seems to know whence it came. We dealt with it some years ago in Khedivial Line, S. A. E. v. Seafarers' Union, 278 F.2d 49, 52 (2 Cir. 1960) (per curiam). At that time we could find only one case where jurisdiction under it had been sustained, in that instance violation of a treaty, Bolchos v. Darrell, 3 Fed.Cas.No.1,607, p. 810 (D.S.C.1795); there is now one more. See Abdul-Rahman Omar Adra v. Clift, 195 F.Supp. 857, 863–65 (D.Md.1961). Here there is no allegation of anyone's violating a treaty. The reference to the law of nations must be narrowly read if the section is to be kept within the confines of Article III. We cannot subscribe to plaintiffs' view that the Eighth Commandment "Thou shalt not steal" is part of the law of nations. While every civilized nation doubtless has this as a part of its legal system, a violation of the law of nations arises only when there has been "a violation by one or more individuals of those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings inter se." Lopes v. Reederei Richard Schroder, 225 F.Supp. 292, 297 (E.D.Pa.1963). See also Damaskinos v. Societa Navigacion Interamericana, S. A., Pan., 255 F.Supp. 919, 923 (S.D.N.Y. 1966); Valanga v. Metropolitan Life Insurance Co., 259 F.Supp. 324, 328 (E.D. Pa.1966). We therefore turn to the two sections of the securities laws.

The only discussion of this in the court's opinion is a footnote:

sales of almost $122,000,000 of portfolio securities, which were listed and registered in the United States, through orders placed with exchange member-firm brokers and affiliates in the United States in order to induce IIT's investment in Vencap. There is no sufficient evidence of this. The sales began in April 1972, some time before Pistell's first mention of Vencap to Graze and five months before the memorandum. Insofar as they were based on Pistell's views concerning the perilous position of the stock market, IIT should be grateful. In any event there clearly was no need for IIT to make sales of anything like this magnitude in order to invest $3,000,000 in Vencap.

When, as here (1) much of the preparation of the actual document which formed the basis of the allegedly fraudulent conduct occurred in the United States; and (2) one defendant, who owns and controls other defendants is a United States citizen and the plaintiff corporation has United States citizens and residents as shareholders, it appears that this court has subject matter jurisdiction over such a matter.

Taking first the element that "one defendant, who owns and controls other defendants is a United States citizen", we do not think that this alone would give subject matter jurisdiction. Although the United States has power to prescribe the conduct of its nationals everywhere in the world, see Restatement (2d) of the Foreign Relations Law of the United States, § 30(1)(a) (1965), Congress does not often do so and courts are forced to interpret the statute at issue in the particular case. As said in Steele v. Bulova Watch Co., Inc., 344 U.S. 280, 282–83, 73 S.Ct. 252, 254, 97 L.Ed. 252 (1952); "Resolution of the jurisdictional issue in this case therefore depends on construction of exercised congressional power, not the limitations upon that power itself." The upholding of subject matter jurisdiction in *Steele* rested not simply on the American citizenship of the defendant but on the effect of his acts in Mexico upon Bulova's sales in Texas. *Id.* at 285, 73 S.Ct. 252. It is simply unimaginable that Congress would have wished the anti-fraud provisions of the securities laws to apply if, for example, Pistell while in London had done all the acts here charged and had defrauded only European investors.

We likewise find little factual support for the view that Pistell's activities had a significant effect in the United States because IIT allegedly has United States citizens and residents as fundholders.

Although IIT's prospectus stated that shares were "neither offered for sale nor sold to U.S. citizens or U.S. residents", the judge found that "approximately 300 United States citizens and residents are fundholders in IIT". Appellants sharply attack this finding. They say that the court had first ruled that plaintiffs' oral and documentary evidence had failed to prove that IIT had any United States fundholders; that his subsequent contrary finding was based on a letter from plaintiffs' counsel on the day of his decision saying that plaintiffs did have such fundholders and that an affidavit to that effect would be forthcoming; that the affidavit was filed twenty days after the decision; and that they had no opportunity to challenge it. Moreover they argue that the affidavit shows the existence of such fundholders only as of December 31, 1972 and that this would not prove what the situation was if the fraud was completed in October 1972, the date when the district court seems to have found the fraud was committed.[28]

■ We do not find it necessary to resolve these controversies, although we do not find the last contention very persuasive in view of the unlikelihood that all the American purchases were between October and December. Taking the view most favorable to the plaintiffs, the 300 American fundholders were only .2% of IIT's fundholders. Even assuming—although we have been cited no evidence to support this—that the United States holders had invested proportionately more than the foreigners, their investment would have represented only some .5% of the total. In contrast to Bersch v. Drexel Firestone, Ltd., 2 Cir., 519 F.2d 974, this day decided, the fraud was practiced not on individual Americans who purchased securities but on the trust in which they had invested. Even on some of the theories listed

---

**28.** The affidavit of Peter G. Wood, who since January 1966 has been responsible for the maintenance of the records of the fundholders of IIT, stated that as of December 31, 1972 there were approximately 150,000 fundholders of IIT, of whom 111 were United States citizens residing outside the United States, 67 were United States citizens residing inside the United States, and 159 were United States residents who are not citizens thereof.

above which assume complicity by IIT's management, the action would be a derivative one on IIT's behalf. The American residence or citizenship of certain fundholders would thus become important only on a theory akin to that of piercing the corporate veil. But if the veil were pierced, the result would be almost wholly non-American. To pose another hypothetical, we cannot believe that Congress would have intended the anti-fraud provisions of the securities laws to apply if Pistell, in London, had defrauded a British investment trust by selling foreign securities to it simply because half of one per cent of its assets was held by Americans. Clearly this is not within the formulation in *Schoenbaum*:

> We believe that Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities.

405 F.2d at 206. And even though *Schoenbaum* does not necessarily set the outmost reaches for subject matter jurisdiction with respect to foreign activities having effect within the United States,[29] the losses from this $3,000,000 investment to these 300 American investors, owning only some .5% of a foreign investment trust which reported net assets of $263,000,000 as of December 31, 1971, and the shares of which apparently were not intended to be offered to American residents or citizens, is not the "substantial" effect within the territory of which the Restatement of Foreign Relations Law § 18(b)(ii) speaks.[30]

This leaves the third ground, activity within the United States. Defendants contend that even if there were more relevant activity than they claim can be properly found, this would be inconsequential since there were neither the effects described in the foregoing quotation from *Schoenbaum* nor the direct effect on an American investor that existed in *Leasco*. However, as we have said in *Bersch*, "the absence of certain of the elements which led to finding subject matter jurisdiction in those cases does not necessarily preclude a similar conclusion on the different facts presented here."

We do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners. This country would surely look askance if one of our neighbors stood by silently and permitted misrepresented securities to be poured into the United States. By the same token it is hard to believe Congress meant to prohibit the SEC from policing similar activities within this country; we doubt that the result in SEC v. United Financial Group, Inc., 474 F.2d 354, 357 (9 Cir. 1973), would have differed if the court had not been able to find that the issuer was an American corporation and that three American investors held $10,000 of its probably worthless stock. If there would be subject matter jurisdiction over

---

**29.** We said in Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1334 (2 Cir. 1972):

> When no fraud has been practiced in this country and the purchase or sale has not been made here, we would be hard pressed to find justification for going beyond *Schoenbaum*.

While all the defendants in *Leasco* were British citizens, we would not have written that sentence otherwise if there had been an American collaborator, resident in London, despite the fact that the purchaser of the securities of the English corporation alleged to have been misrepresented was a publicly owned American corporation with preponderantly American shareholders.

**30.** As previously stated, the court's finding that the funds used by IIT to purchase the Vencap shares were drawn from a bank in New Jersey appears to have been clearly erroneous. Even if it were correct, we doubt that use of such funds would be the kind of effect within the United States referred to in § 18 and in the relevant cases.

a suit by the SEC to prevent the concoction of securities frauds in the United States for export, there would also seem to be jurisdiction over a suit for damages or rescission by a defrauded foreign individual.[31] Our ruling on this basis of jurisdiction is limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in foreign countries, such as in *Bersch*. Admittedly the distinction is a fine one. But the position we are taking here itself extends the application of the securities laws to transnational transactions beyond prior decisions and the line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between the something and a consummated fraud and however negligible the effect in the United States or on its citizens.

■ Defendants say that even if we should go beyond *Schoenbaum* and *Leasco* to this extent, plaintiffs' case still fails since there was no significant activity within the United States. We think this is true on the theory of fraud denominated above as (1), on which the court seems to have based its ruling, and, very likely, on the theories designated as (2) and (3). So far as these theories are concerned, the only thing done in the United States appears to have been the exchange by the American attorneys for IIT and Vencap of drafts of the purchase agreement of September 29, 1972,[32] which simply formalized what seems to have been a deal worked out in the Bahamas. However, as we move into theories (4) and (5), the picture changes. Once Vencap obtained the $3,000,000 it appears to have used the Havens, Wandless office at 99 Park Ave-

nue in New York as its base. The court found that "[l]iterally hundreds of transactions and pieces of mail for Vencap and to a lesser extent for Intervent and Intercapital were initiated, directed and consummated from and received at 99 Park Avenue," and that all its transactional records were maintained there. On theory (5), whereby the suit would be regarded as a derivative one on behalf of Vencap for fraudulently inducing it to purchase securities on the basis of the Supreme Court's *Superintendent of Insurance* decision, the acts may well have been performed in the United States. And even on theory (4), while such acts might be viewed as merely evidencing Pistell's fraudulent intention when he induced IIT's investment, we see no reason why they could not also be regarded substantively as the acts that consummated the fraud. Even if at the time of the closing Pistell intended to use part of IIT's $3,000,000 investment in Vencap for his personal benefit, IIT could hardly have sued for the misrepresentation at that time. The subsequent acts would not only be evidence of the misrepresentation but the cause of the damage.

The difficulty is that while there was an abundance of American activity, we cannot tell whether the district judge considered it to be within Rule 10b–5 or whether it was. Here again, with respect to theories (4) and (5), we need further findings as to the wickedness of particular transactions and as to whether they were engineered from the United States.

### V. *Disposition.*

■ Normally if we conclude that the grounds on which a district court had issued a temporary injunction were seriously deficient with respect to subject matter jurisdiction or the merits, we

---

**31.** Class actions may stand differently, for reasons developed in *Bersch*—primarily the likelihood that a very small tail may be wagging an elephant and that there is doubt that a judgment of an American court would protect the defendants elsewhere.

**32.** Plus Taylor's drafting of the redemption provision, see note 7 *supra*.

would reverse without prejudice to a new application[33] even though we could discern in the record other grounds that might justify the issuance of one.[34] This case, however, is *sui generis.* Plaintiffs are no ordinary stockholders; they have supplied $3,000,000, being 99.9% of Vencap's capitalization. Dissolution of the injunction might permit substantial assets to be spirited away. The common stockholders, the real parties in interest against the injunction,[35] have made a total investment of $4,000 and are protected by an injunction bond of $50,000. Moreover, as is discussed more fully in Part VI below, in its supplemental order of August 2, 1974 the district court significantly liberalized the terms of the receivership; subject to scrutiny of proposals by the receiver and approval of them by the district court Vencap is to be permitted to continue engaging in the business of supplying venture capital. Thus far the receiver has not been deaf to Vencap's investment proposals, as the next section of this opinion shows. Defendants have been in no hurry to get the matter before us. No application was made to expedite the appeal, and more than six months elapsed from the date of the injunction to the filing of appellants' briefs.

Under all these truly extraordinary conditions, we shall use our power under 28 U.S.C. § 2106 to "require such further proceedings to be had as may be just under the circumstances" by retaining jurisdiction over this appeal pending further findings and conclusions by the district court on the present or, preferably, a supplemental record. With the large record already accumulated, it might well be desirable for the district court to advance the trial on the merits and consolidate this with the supplemental hearing, Fed.R.Civ.P. 65(a)(2). All this should be done as soon as the court's calendar permits. If the district court determines to continue the temporary injunction and receivership pending final disposition, defendants may ask this panel to fix a schedule for further briefs and argument. If the court proceeds to a final disposition and grants an injunction or makes the appointment of the receiver permanent, a new appeal will be necessary, but we will allow use of the appendices already filed. The same procedures should be followed, *mutatis mutandis,* if the court determines to deny preliminary or final relief; in that event it is directed to stay its order for at least ten days to permit an application to this court for a further stay pending appeal.

33. In saying this we, of course, do not mean to signal any departure from the rule that even when a plaintiff has not shown probable success on the merits and possible irreparable injury, a preliminary injunction may issue if he has shown "sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Sonesta Int'l Hotels Corp. v. Wellington Assocs., 483 F.2d 247, 250 (2 Cir. 1973), a statement drawing support from Judge Frank's much cited opinion in Hamilton Watch Co. v. Benrus Watch Co., Inc., 206 F.2d 738, 740 (2 Cir. 1953), and from more recent cases such as Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2 Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969), and Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co., Inc., 476 F.2d 687, 692–93 (2 Cir. 1973). While plaintiffs meet the second requirement, a balance of hardships tipping decidedly in their favor, we do not think that on the only ground clearly found by the dis-

trict court, namely, that which we have labeled as (1), there is "a fair ground for litigation" either on subject matter jurisdiction or on the merits.

34. If the other grounds would have *compelled* the issuance of one, we would affirm on the basis that the appellee may defend a judgment on grounds supported by the record other than that on which it was issued. Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520 (1931). But that is not the situation here.

35. No injunction has been issued against the attorneys—Murphy, Taylor or Havens Wandless. Plaintiffs contend that therefore they have no standing to appeal. Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 281–84, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946), arguably indicates that they do, but we need not decide the point. Pistell and the three corporations have standing and we would have permitted the attorneys to file a brief as *amici curiae.* Indeed, we have found their briefs exceedingly helpful.

## VI. Plaintiffs' Cross-Appeal.

On August 2, 1974, Judge Stewart entered a supplemental order directing, *inter alia*, the defendants Pistell, Vencap, Intervent and Intercapital to provide the receiver with a detailed statement and explanation respecting current investment prospects including, without limitation, the proposed investments in a corporation attempting to import Turkish wine and in a mining concession in the Cameroons, see note 16 *supra*, and directing the receiver to report to the court thereon. Apparently as a result, the court, on motion of these defendants, made an order dated September 3, 1974 allowing Vencap to issue checks for a total of $40,000 in connection with the Cameroons transaction. Having unsuccessfully moved for a stay, plaintiffs appeal.

We do not think the September 3 order is appealable. It is not a final order under 28 U.S.C. § 1291 since the underlying action remains pending. To be sure, it finally disposes of the $40,000 but we do not believe the doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), was intended to apply to the scores of discretionary administrative orders a district court must make in supervising its receiver. Neither is it appealable under 28 U.S.C. § 1292(a)(2) ("Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property."). The only clause that might conceivably be applicable is the last, but this seems to have been properly read as directed only to situations in which an application has been made by an interested party to have the receivership completed by sales or other dispositions and the district court has refused so to order. See, e. g., Kindy v. Koenke, 216 F.2d 907, 910 (8 Cir. 1954). See also Skirvin v. Mesta,

141 F.2d 668, 672 (10 Cir. 1944). Finally, we do not believe the order is appealable under 28 U.S.C. § 1292(a)(1) as a modification of the July 3 preliminary injunction preventing the defendants from expending or investing any of Vencap's assets. As indicated above the August 2, 1974 supplemental order provided that the receiver was to evaluate proposed investments reported to him by Pistell, Vencap, Intervent, and Intercapital, and report to the district court his recommendations with respect thereto; it further modified the July 3 order to the extent of authorizing the receiver to compensate Pistell, subject to the approval of the court, for the reasonable value of any services which he might render in negotiating and reporting projects to the receiver, provided that the receiver was apprised in advance and approved of the contemplated expenditure prior to its disbursement. While the August 2 order modified the district court's July 3 order granting the preliminary injunction and appointing a receiver, plaintiffs have not appealed from that. They cannot now appeal from an order which has neither further modified the terms of the preliminary injunction nor the powers of the receiver, but which merely permits an expenditure in accordance with the provisions of these previous orders.[36]

If we have jurisdiction, the September 3 order must be affirmed. The plaintiffs have nowhere supplied any information why the Cameroons investment would be inappropriate other than to talk about certain of Vencap's past investments which have not been profitable. Without such a showing it would be wholly inappropriate for us to substitute our judgment for the informed discretion of the receiver which has been approved by the district court. Even in bankruptcy, where interlocutory orders are appealable as of right under § 24a of the Bankruptcy Act, appellate courts either af-

---

**36.** The record does not explain why the checks for the Cameroons venture were to be issued by Vencap rather than the receiver, although this would appear consistent with the idea that the enterprise would continue to function as a venture capital firm, each new investment being subject to receiver scrutiny and court approval.

firm discretionary orders routinely when no abuse of discretion has been shown or dismiss the appeal for the same reason. 2 Collier, Bankruptcy § 24.39[2] at 798 (1975).

On the defendants' appeal we retain jurisdiction pending further proceedings in the district court consistent with this opinion. Plaintiffs' cross-appeal is dismissed. No costs at this time.

## APPENDIX A

VEN-CAP LIMITED

P.O. Box N-4645
Nassau, Bahamas
Telephone 21381

Richard C. Pistell
*Chairman of the Board*

The within Memorandum is submitted in connection with the private placement of securities referred to herein and may not be reproduced or used in whole or in part for any other purpose.

To: International Capital Investments
(Sterling) Limited
5 Grafton Street,
London W.1.

*Attention: Mr. Stanley Graze*

Private placement of Preferential Shares of Ven-Cap Limited, 30,000 Redeemable Preference Shares of US$100 each plus three year warrants to purchase a further 30,000 of such shares.

Ven-cap Limited ("the Company") is a non-resident Bahamian company formed under The Companies Act of the Bahamas and designated as such in accordance with Section 41(2) of the Exchange Control regulations of the Bahamas. Exchange Control permission for the incorporation of the Company and the issuance of shares under Regulation 8 has been obtained from the Bahamian Monetary Authority.

The Company was initially formed of a nominal capital of US$5,000 with ordinary common shares of US$1 par being issued therefor. A total of 5,000 such shares are authorized and outstanding. The primary purpose for organizing the Company was to afford a vehicle for knowledgeable investors of a limited number to participate through 'preferential capital investment' in a sophisticated investment program with respect to growth opportunities throughout the world. Management (see this topic below) offers a broad international and financial experience in venture capital programs. The Company's purpose and philosophy are directed toward the sound investment of preferential capital utilizing management's contacts and experience in growth opportunities which are designed to reflect both short and long term returns on investment.

The principal stockholders of the Company are:—Amaury de Riencourt, an internationally known Investment Banker and Counsellor, resident in Paris and Richard C. Pistell, another internationally known Investor, Financial Consultant and Manager whose broad experience includes airline financing.

In addition, the Company is currently negotiating for the acquisition of an equity and debt position in a leading Caribbean air carrier with routes into Miami and other ports in Florida. Such an air carrier, whose name cannot at this juncture be disclosed pending conclusion of negotiations, is on the verge of introducing jet service to certain of its domestic and foreign routes. But, significantly, even in the absence of jet service with which it must compete with such international carriers as Pan Am and Eastern, such carrier has earned in excess of $350,000 in the past six months commencing March of 1972. The Company is contemplating an investment consisting of debt and equity of up to $1,500,-000 which it believes will significantly contribute to the strengthening of operations and earnings of the air carrier and offers real prospects for early and substantial return on the Company's investment. This is just one of the several outstanding prospects which the Compa-

APPENDIX—Continued

ny is contemplating and which, through the utilization of the initial preferential capital investment of assets required therewith, will enable the Company to establish a broad investment base designed to offer, as noted above, short and long term returns which will inure primarily to the benefit of the preferential capital investors. The Company proposes to offer on a very limited basis an aggregate initially of $3,000,000 in preferred shares. The capital realized from such offering is what is herein referred to as the 'preferential capital investment'. The preferential rights attributable to such shares are set forth in a resolution of the Company dated 31st August, 1972, a copy of which is annexed hereto. In outline, however, such preferential shares will have dividend entitlement of 6 per cent payable as and when declared by the Board of Directors at the end of each fiscal year to the extent earnings are available therefor plus an additional dividend of up to one-third of the residual earnings, i. e., the net earnings after all expenses and taxes and the payment of the initial 6 per cent dividend.

In addition, subscribers to the preferred shares will receive warrants entitling them to subscribe for a period of three years on a pro rata basis to an additional $3,000,000 in preferred shares of the same class and preference as the initial subscription and at the same price notwithstanding that the book value or earnings of the Company at the time of the exercise of such warrants might otherwise require a higher price.

Inasmuch as this limited offering is being made to a select group of sophisticated investors it is perhaps unnecessary to point out that notwithstanding the solid management experience and background which the Company offers at this early stage in its development any investment must be viewed as speculative. The Company is aware that investment of the type herein offered is not for the ordinary investor but for the investor who recognizes that risk deserves a high return.

## VENCAP LIMITED

At an Extraordinary General Meeting of the members of the above-named Company held at the Registered Office of the Company, Building No. 309, Bay Street, Nassau, Bahamas on the 31st day of August, A.D., 1972, the subjoined Ordinary Resolution was duly passed.

On motion duly made and seconded, the following Ordinary Resolution was unanimously agreed to, namely:—

Resolved that the capital of the Company be increased to US$3,010,000 divided into 10,000 Ordinary Shares of US$1 each and 30,000 Redeemable Preference Shares of US$100 each by the creation of 5,000 Ordinary Shares ranking in all respects pari passu with the existing Ordinary Shares in the Capital of the Company and 30,000 Redeemable Preference Shares of US$100 each conferring upon the holders thereof the following rights and issued subject to the following provisions:—

(1) The right in a winding-up of the Company to repayment of the capital paid up thereon in priority to the Ordinary Shares but shall not entitle the holders thereof to any further or other participation in the profits or assets of the Company in a winding-up;

(2) The right to receive out of the profits of the Company which it shall be determined to distribute in respect of any fiscal year of the Company to 31st December a fixed noncumulative dividend at the rate of six per cent per annum on the capital for the time being paid up thereon in priority to any dividend on the Ordinary Shares provided that no dividend shall be payable in respect of any of the said shares which were not issued and fully paid on the first day of such fiscal year;

(3) The right to receive a further noncumulative dividend if declared in respect of each fiscal year of the Compa-

APPENDIX—Continued

ny and in priority to any dividend on the Ordinary Shares in respect of the said fiscal year of an aggregate amount equal, as a class, to one-third of the Residual Earnings of the Company for the said fiscal year.

"Residual Earnings" shall mean for the purposes hereof the net earnings of the Company calculated without regard to any extraordinary items for the said fiscal year, as certified by its auditors, after deduction therefrom of (i) all amounts charged against such net earnings in respect of all taxes, duties or other impositions (ii) the said 6% dividends provided in paragraph (2) hereof, and (iii) interest, dividends or other distributions paid to the holders of any class of shares or securities of the Company carrying rights to such dividends in priority to the rights of the holders of the said Redeemable Preference Shares. The certificate of the independent firm of public accountants regularly employed by the Company in the audit of its books shall be conclusive and binding upon the Company and the holders of the Redeemable Preference Shares with respect to the amount of the Company's net earnings and the amount of the Residual Earnings.

(4) The said dividends provided in paragraphs (2) and (3) hereof, if declared, shall be declared and paid by the Company within 60 days of the receipt by the Company of its Auditors report and audited balance sheet for each fiscal year of the Company;

(5) The Company at its option may redeem out of any profits or monies of the Company which may lawfully be applied for that purpose all or any of the Redeemable Preference Shares outstanding at any time by paying therefore in cash US$100 per share plus an amount per share, payable in lieu of the dividends provided in paragraphs (2) and (3) hereof, equal to a dividend accruing at the rate of six per cent per annum on the capital for the time being paid up in respect of the period commencing on the first day of the fiscal year of the Company in which the redemption occurs and ending on the date of redemption. Notice of redemption specifying the time and place of redemption shall be mailed to the holders of Redeemable Preference Shares whose shares are to be redeemed at their respective addresses as the same may appear on the records of the Company at least fifteen days prior to the date specified therein for redemption. From and after the date specified in any such notice as the redemption date, unless the Company shall fail to provide monies at the time and place specified in such notice for the payment of the redemption price, all rights of the holders thereof as shareholders of the Company, except the right to receive the redemption price, shall cease and terminate. If the Company should at any time determine to redeem a part only of the said Redeemable Preference Shares for the time being outstanding, the shares to be redeemed shall be determined by a drawing to be made by the directors at the Registered Office of the Company or such other place as the directors may determine;

(6) The said Redeemable Preference Shares shall not entitle the holders to receive notice of or attend or vote at any general meeting by virtue of their holdings thereof unless the business of the meeting includes the consideration of a resolution for the sale of the undertaking of the Company or for altering the objects of the Company or for winding-up the Company or any resolution varying or abrogating any of the special rights or privileges attached to the said Redeemable Preference Shares or for the creation of any class of shares or securities of the Company carrying rights as to dividend or in a winding-up of the Company in priority to the said Redeemable Preference Shares in which case they shall only be entitled to vote on any such resolution.

APPENDIX—Continued

I, Jeremy Carson James Waddell, Assistant Secretary of Vencap Limited, hereby certify that the foregoing is a true copy of an Ordinary Resolution which was duly passed as an·Ordinary Resolution at a meeting of the above-named Company held at the Registered Office of the Company, Building No. 309, Bay Street, Nassau, Bahamas on the 31st day of August, A.D., 1972 at which meeting all of the members of the Company for the time being entitled, according to the regulations of the Company, to vote were present in person or by proxy.

In Witness Whereof I have hereunto set my hand and the Common Seal of the Company this 31st day of August, A.D., 1972.

Seal

(Sgd.) J.C.J. Waddell,
*Assistant Secretary.*