VENTURE FUND (INTERNATIONAL) N. V. (by Jacob A. Schiltkamp and D. G. Hartog—Its Trustees in Bankruptcy and Trustees in Liquidation), Plaintiff,

v.

WILLKIE FARR & GALLAGHER et al., Defendants.

No. 75 Civ. 5978.

United States District Court, S. D. New York.

Aug. 13, 1976.

Forsyth, Decker, Murray & Broderick, New York City, for plaintiff; Vincent L. Broderick, John Linsenmeyer, Samuel J. Murray, New York City, of counsel.

Kostelanetz, Ritholz & Mulderig, New York City, for defendants Conwill, Merritt and D'Alimonte; Edward J. Daus, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for Willkie, Farr & Gallagher; Floyd Abrams, James J. Foster, Sandra S. Baron, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

Asserting claims under the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, the complaint invokes § 22(a) of the former, 15

U.S.C. § 77v, § 27 of the latter, 15 U.S.C. § 78aa, and 28 U.S.C. § 1337 as grounds for this court's jurisdiction.[1] The plaintiffs are the trustees of Venture Fund (International) N.V. ("Venture Fund"), a foreign corporation in liquidation.[2] The defendants are the law firm of Willkie Farr & Gallagher ("Willkie Farr"), Allan F. Conwill, Raymond W. Merritt, and John S. D'Alimonte, members of that firm, Robert Vesco, and several of Vesco's former business associates.[3]

This is another in a long series of cases emanating from the alleged manipulation and looting of IOS and its corporate family by Robert Vesco and his associates. The essence of the particular scheme alleged here is that the defendants conspired to defraud Venture Fund by (1) liquidating some $20 million of its portfolio invested in marketable U. S. securities and (2) reinvesting the proceeds in the illiquid securities of Global Holdings Limited and Global Financial Limited ("the Global companies"), two Bahamian corporations created by defendant Vesco, for the ultimate purpose of misappropriating Venture Fund's $20 million. The Willkie Farr defendants are charged, *inter alia*, with having knowledge of the scheme, having been instrumental in its creation, and with malpractice in the exercise of their duties as counsel to Venture Fund during the period of the transactions complained of.

There are two motions to dismiss. One, by individual defendants Conwill, Merritt, and D'Alimonte, may be disposed of fairly briefly. They assert that the complaint fails to plead a claim upon which relief may be granted.[4] Recognizing the liberality with which complaints are read upon such occasions, the movants nevertheless find plaintiffs' effort fatally inadequate. It will suffice to say the court disagrees.

The other motion, by the defendant law firm, is substantially more imposing. It tenders an array of grounds for dismissal, all interesting and interestingly briefed. The court concludes, however, that while one or more of these grounds may defeat the plaintiffs after a trial, none can accomplish that end now.[5]

### I.

Since most of the allegedly injured parties are foreign citizens, and since a considerable portion of the events giving rise to this action took place abroad, we have the difficult and recurring question of the proper international reach of the federal securities laws. The court has been led to revisit the learning most recently canvassed and extended in two of Judge Friendly's comprehensive opinions, *Bersch v. Drexel Firestone, Incorporated,* 519 F.2d 974 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *IIT v. Vencap, Ltd.,* 519 F.2d 1001 (2d Cir. 1975). In the end, that learning defeats this branch of defendants' motion to dismiss for lack of subject-matter jurisdiction.

Venture Fund and its bankruptcy trustees are all citizens of Netherlands Antilles. Venture Fund has 22,000 shareholders, only two of whom are American citi-

1. Since there are specific jurisdictional provisions in the federal securities laws, the citation of 28 U.S.C. § 1337 adds nothing. See *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir. 1975).

2. Venture Fund was one of the so-called "dollar funds" of Investors Overseas Services, Ltd. ("IOS").

3. These are (1) Norman LeBlanc, an accountant, who performed various roles in several of the IOS entities and owned Global Holdings Limited and Global Financial Limited, (2) Milton F. Meissner, a director of Venture Fund, and (3) John B. Schuyler, another director.

None of these defendants nor defendant Vesco has been served.

4. Insofar as their motion also invokes the grounds of the motion by the defendant law firm, hereinafter discussed, the denial of that motion disposes of the individual defendants' motion as well.

5. The Willkie Farr motion invokes Rule 12(b)(1) and (6). There is considerable reliance, however, upon evidentiary materials. To this extent, if it matters, the prayer may be deemed to be for summary judgment. See Fed. R.Civ.P. 12(b).

zens.[6] None of the shares of Venture Fund or the Global companies, both Bahamian corporations, are traded on any domestic exchange or counter. The agreements consummating the investments in the Global companies were seemingly drafted, approved, and executed in the Bahamas. The American "contacts" allegedly included (1) a disputed number of meetings held in New Jersey concerning how to "close-end" the dollar funds,[7] (2) selling $20 million of Venture Fund's U. S. portfolio on domestic exchanges, (3) using domestic banks as custodians for Venture Fund's U. S. securities and funds, and (4) a number of telephone calls between the Bahamas and New York, including one from Bruno Lederer, compliance officer of the dollar funds, to defendant Merritt, for an opinion as to the legality of the Global transactions. The call to Merritt is alleged to have been a "but for" cause of the consummation of the Global transactions.[8] There were other activities that took place in the United States after the Global transactions were closed, but the significance of these to plaintiffs' allegations of securities fraud, and thus to subject-matter jurisdiction, is not apparent at this juncture.

■ Since there is no explicit Congressional learning on the subject, see *Bersch v.* *Drexel Firestone, Incorporated, supra,* 519 F.2d at 993, a court "confronted with transactions that on any view are predominantly foreign * * * must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." *Id.* at 985. In making this determination, the approach has been to assess what is permitted by the principles of international relations law,[9] and then to decide whether Congress would want to go that far (or farther) in light of the dual purposes of the securities laws to protect American investors and the domestic securities markets.[10] Under that reasoning, the Second Circuit has recently decided that the federal antifraud provisions:

"(1) Apply to losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country; and

"(2) Apply to losses from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to act) of material importance in the United States have significantly contributed thereto; but

"(3) Do not apply to losses from sales of securities to foreigners outside the

6. As of September 1972, there were apparently two non-resident American citizens and nine non-citizen American residents who held Venture Fund securities. Indirect injuries that may have been incurred by these few persons as a result of the fraud allegedly perpetrated on Venture Fund could not of themselves constitute effects within the United States substantial enough to sustain jurisdiction under the federal securities laws. See *IIT v. Vencap, Ltd., supra,* 519 F.2d at 1016–17.

7. Because of the severe cash flow problems caused by a large, and growing, number of redemptions, it was decided that Venture Fund should be transformed into a closed-end mutual fund.

8. For purposes of determining whether subject-matter jurisdiction exists in a securities fraud action, telephone calls to the United States may be relevant domestic activities. See *Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d 1326 at 1335. It remains to be seen, however, just what transpired in the various conversations and what their significance was, if any, to the alleged fraud.

9. The pertinent principles are contained in the Restatement of Foreign Relations Law of the United States (Second) §§ 17 and 18 (1965). Section 17 sets forth the circumstances under which the United States has jurisdiction to prescribe a rule governing conduct within its territory. Section 18 deals with the circumstances under which laws may be permissibly applied to conduct occurring outside the nation's borders but having effects within it.

10. "We believe that Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities." *Schoenbaum v. Firstbrook,* 405 F.2d 200, 206 (2d Cir. 1968).

United States unless acts (or culpable failures to act) within the United States directly caused such losses."

*Id.* at 993.

■ In the instant setting, plaintiffs must seemingly come within the exception to the third test in order to state a viable federal claim. It is apparently not enough that defendants, or some of them, are United States nationals and performed various "preparatory" acts here. See *IIT v. Vencap, Ltd., supra,* 519 F.2d at 1016, 1018; *Bersch v. Drexel Firestone, Incorporated, supra,* 519 F.2d at 985–88. In essence, what plaintiffs must show is that the United States was "used as a base for manufacturing fraudulent security devices for export," or at least that the acts performed here were themselves fraudulent and not merely preparatory. *IIT v. Vencap, Ltd., supra,* at 1018. "Admittedly the distinction is a fine one." *Id.* It cannot be made, at least in this case, without a full airing of the relevant facts. See *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1330 (2d Cir. 1972).

■ The clearest lesson in the precedents is that the kind of jurisdictional problem we confront here must be decided with close and particular attention to concrete facts. We have been taught "the importance of ascertaining as precisely as possible the exact means by which the alleged fraud has been accomplished, since * * * both the question of jurisdiction and the availability of a remedy may turn upon this." *IIT v. Vencap, Ltd., supra,* at 1009. It is necessary "to ascertain exactly what was done— by whom, when, and where * * *." *Id.* at 1006 n. 7. We have also been specially instructed in cases of this kind that plaintiffs are "entitled to every favorable inference." *Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1330, *citing Steele v. Bulova Watch Co.,* 344 U.S. 280, 284, 73 S.Ct. 252, 97 L.Ed. 252 (1952).

In a still developing area, where there may be a need for fine distinctions, live testimony and detailed evidence are likely often to supply the only safe groundwork for deciding "what inferences are most reasonable, as they bear both on subject matter jurisdiction and on the merits * * *." *IIT v. Vencap, Ltd., supra,* 519 F.2d at 1007 n. 7.

The fact that this sector of the law is still in flux adds special force to the requirement of a full factual record. We have not the luxury—or the dull chore, according to taste—of simply matching the new cases to one or another old paradigm. "[T]he absence of certain of the elements which led to finding subject matter jurisdiction in [earlier] cases does not necessarily preclude a similar conclusion on the different facts presented here." *Bersch v. Drexel Firestone, Incorporated, supra,* 519 F.2d at 986. It is necessary even at *nisi prius* to fashion rough elaborations of principles still in process of formulation. It may not be enough, for example, to classify specific actions as "merely preparatory" or the "perpetration of fraudulent acts themselves," *IIT v. Vencap, Ltd., supra,* 519 F.2d at 1018, and then plod from that to a conclusion.[11] The new dimensions of the two latest precedents are unlikely to be the last.

Sharply divergent accounts of the "facts" —or what the facts may turn out to have been—are given in the parties' extensive papers. Plaintiffs tender a substantial roster of "acts," by the movants and others, said to bring the case within the jurisdiction of our federal securities laws. Willkie Farr gives a quite different factual picture, and makes seemingly cogent attacks upon the materiality of some things in plaintiffs' list. The impulse to track this analysis and deal specifically with these items now is opposed by counsels of judicial prudence. The solid conclusion that emerges is that this is a case that must be tried rather than decided on papers.

---

11. For the view that the distinction between "preparatory" and "fraudulent acts themselves" may not be decisively useful when professionals, such as lawyers and accountants, are accused of participating in securities violations in their professional capacities, see Note, *American Adjudication of Transnational Securities Fraud,* 89 Harv.L.Rev. 553, 571 n. 102 (1976).

While the court has concluded that a detailed account of the open questions of law and fact is not useful at this time, a few observations may do no harm:

(1) Without live testimony of the Willkie Farr and other people, it is premature to say whether their actions were peripheral, "merely preparatory," or more significant.

(2) The character of Venture Fund as an investor in U.S. securities, though clearly not decisive, may well be material.[12]

(3) Likewise for the large sale of U.S. securities to obtain funds to be invested in the Global Companies. See *The Fund of Funds, Limited v. Vesco*, Current CCH Fed.Sec.L.Rep. ¶ 95,644 at 90,196 (S.D.N.Y. July 12, 1976).

(4) Other "facts" alleged by plaintiffs, if proved or disproved, may tend in relevant fashion to move the center of gravity of the case toward or away from this country in ways better determined after the facts are in rather than before.

## II.

Since jurisdiction and the merits run so closely together, and since the court may err in any event on this subject, it will be necessary to notice, now and later, the claims of diversity jurisdiction and the arguments defendants mount against them.

The requirement of "complete diversity" is incapable of fulfillment, Willkie Farr says, because there are several non-diverse defendants. Since all but one of these have not been (and probably will not be) served, it is enough (and difficult enough) to consider only the one. The defendant in question is Jay F. Leary, a Willkie Farr partner, who has been living in France for nine years though he is still an American citizen. He is "stateless," defendants say, and, since diversity must be shown for all members of

the partnership, this defeats the jurisdiction.

■ There is a threshold question requiring (or warranting) more evidence. Whether Mr. Leary has in fact relinquished his U.S. domicile, as now appears from his affidavit, is a subject for proof or disproof. Plaintiffs have not been vigorous about this, but there is no great loss. Since the case seems destined for trial in any event, plaintiffs are directed to proceed without delay to develop an evidentiary record deemed sufficient on this subject. This may be done by deposition and other discovery, followed by a suitable pretrial motion. Or it may be done by some other form of hearing pursuant to Fed.R.Civ.P. 12(d). Plaintiffs should assume the laboring oar on this subject and see that it is dealt with in timely fashion.

If the facts as found warrant a characterization of Mr. Leary as "stateless," there remains a cogent argument that a "stateless" person is a "zero" who cannot destroy diversity. Substantial contentions are made on the other side. The court will resolve the question if it has to.

■ Finally, plaintiffs tell us the whole subject may be academic because they are undertaking to serve all the Willkie Farr partners, who are jointly and severally liable in any event. What the effect of this may be upon partners not specifically named as defendants is neither briefed nor necessary to decide now. Before the case comes to be tried—at the latest, before it is decided—plaintiffs will have the burden of showing that parties named or not named supply, and do not destroy, the claimed jurisdiction.

## III.

■ There are questions as to statutes of limitations. The arguments mounted against the state claims appear substantial.[13] But, once again, the route to an-

---

**12.** Although the Second Circuit's opinions in *IIT, supra,* do not mention the investment in U.S. securities as a jurisdictional fact, its relevance as such is not foreclosed.

**13.** Defendants' contentions as to the federal claims do not fare as well. As they concede, the courts of this Circuit have uniformly applied the six-year provision of N.Y.C.P.L.R.

swers is strewn with triable issues of fact. Denial of the motion in this respect does not determine, but only postpones, questions as to what claims, if any, are time-barred.

The motions to dismiss are denied. So ordered.

§ 213(9) to claims brought under the antifraud provisions of the federal securities laws. Moreover, it is late in the day to argue that a shorter provision based on negligent conduct only should be applied. If in fact defendants are only guilty of negligently representing Venture Fund, it would seem that they are not liable under the federal securities laws at all. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, 44 U.S.L.W. 4451 (1976). The federal claims must sound in fraud, and the most analogous state limitations provision would seem clearly to be N.Y.C.P. L.R. § 213(9).