FIDENAS AG, Sidesco International Ltd., and Mr. G. P. Jurick, Plaintiffs,

v.

HONEYWELL INC. and Honeywell Information Systems, Inc., Defendants.

BISHOPS INTERNATIONAL BANK LIMITED, Plaintiff,

v.

HONEYWELL INC. and Honeywell Information Systems, Inc., Defendants.

Nos. 77 Civ. 4761 (GLG), 77 Civ. 5598 (GLG).

United States District Court, S. D. New York.

Nov. 13, 1980.

As Amended Jan. 6, 1981.

Whitman & Ransom, New York City, for plaintiffs, Fidenas, et al.; Dugald C. Brown, David G. Taylor, Gary P. Rosenthal, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendants Citicorp Center; Donald B. daParma, Alan C. Drewsen, New York City, of counsel.

Buchalter, Nemer, Fields, Chrystie & Younger, A Professional Corp., Los Angeles, Cal., and Rubin, Baum, Levin, Constant & Friedman, New York City, for plaintiff Bishops International Bank Limited; Harry G. Melkonian, New York City, Stuart D. Buchalter, Los Angeles, Cal., Jeffrey R. Mann, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

In these two actions, which have been treated as consolidated for purposes of

these motions, plaintiffs allege that they were injured by a "multinational fraud" consisting of the issuance, sale, and subsequent dishonoring of approximately $10,000,000 of fraudulent notes. They also allege that those responsible for the fraud include not only Roland Staempfli ("Staempfli"), a Swiss citizen, and his employer, Honeywell Bull (Schweiz) AG ("HBS"), the Swiss corporation whose notes were involved, but also Companie Honeywell Bull S.A. ("CHB"), HBS's French parent; Honeywell Information Systems, Inc. ("HISI"), CHB's American parent; and Honeywell Inc., HISI's parent.

The first of these two actions was brought by Fidenas AG ("Fidenas"), a Swiss corporation, which served as underwriter for the fraudulent notes; Sidesco International Ltd. ("Sidesco"), a Bahamian corporation, which purchased some of the notes from Fidenas; and G.P. Jurick ("Jurick"), a German residing in Switzerland, who was managing executive of Fidenas and Sidesco (collectively, "the Fidenas plaintiffs"). The second action was brought by Bishops International Bank Ltd. ("Bishops"), a Bahamian corporation, whose predecessor, Bishops Bank and Trust Company Ltd., purchased some of the notes from and/or through the Fidenas plaintiffs. In both of these actions, the only defendants are Honeywell Inc., a manufacturer and distributor of computers and control systems organized as a corporation in Delaware and headquartered in Minneapolis, Minnesota; and HISI, a Delaware corporation headquartered in Minneapolis, which handles the computer side of the business of Honeywell Inc. and is majority-owned by Honeywell Inc.

## FACTUAL BACKGROUND

In December 1972, Staempfli, who was then the finance manager of HBS, in Zurich, Switzerland, prepared four purported promissory notes of HBS for a total of DM 3,500,000. He arranged with plaintiff Jurick for plaintiff Fidenas to underwrite the

notes, which were then purchased by plaintiff Sedesco and, within a few days, sold to Bishops,[1] the plaintiff in the second action. A similar financing, in the amount of DM $4,000,000, was arranged by Staempfli through Fidenas in November 1973, with Bishops again being the purchaser. From 1973 to early 1975, under an underwriting agreement between Fidenas and Staempfli, purportedly on behalf of HBS, several more loans were arranged, with the notes being purchased principally by the Merban Corporation, a New York customer of Fidenas.

It was later revealed that the notes were fraudulent, since Staempfli had had no authority to prepare and issue them on behalf of HBS. HBS fired Staempfli in 1975, and he was later convicted of criminal fraud in Zurich, Switzerland. HBS refused to honor the fraudulent notes and, as a result, was sued in Switzerland by Bishops[2] and other noteholders. Meanwhile, the Fidenas plaintiffs and Bishops brought the instant actions in the United States against Honeywell Inc. and HISI. In addition, Fidenas, Sidesco, and Jurick brought another action in this district against HBS and its French parent, CHB, which was dismissed on August 14, 1978, on grounds of lack of standing, lack of subject matter jurisdiction, and lack of in personam jurisdiction. *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.*, No. 78–545 (S.D.N.Y. Aug. 14, 1978), *aff'd*, 606 F.2d 5 (2d Cir. 1979).

## PROCEDURAL BACKGROUND

The original complaint in the Fidenas action was filed in September 1977, and the Bishops complaint was filed in November 1977. Defendants answered neither complaint, but instead, on November 23, 1977, moved to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. The grounds for the motions to dismiss were that plaintiffs in both actions had failed to allege fraud with sufficient particularity and had failed to state a claim, since

---

1. The purchaser was, more precisely, Bishops Bank & Trust Company, Ltd., of which Bishops is the successor corporation.

2. Bishops obtained a judgment against HBS in the Swiss action on April 25, 1979.

defendants did not dominate and control HBS so as to be held answerable for its torts. Pursuant to a recommendation of Magistrate Harold J. Raby on May 2, 1978, which was approved by Judge Marvin E. Frankel on August 7, 1978, the motions to dismiss were held in abeyance so that plaintiffs could conduct discovery on the issue of domination and control and thus, respond to defendants' motions on that issue. After the conclusion of discovery, defendants renewed their motions to dismiss, and argument on the motions was heard on November 15, 1979.

In April 1980, before the issuance of a ruling on defendants' motions, plaintiffs in the Fidenas action filed an amended complaint. Defendants promptly moved to dismiss that complaint as well.

### THE AMENDED COMPLAINT

The original Fidenas complaint, in 23 pages and 79 numbered paragraphs, presents 7 causes of action: (1) common law fraud in the issuance and sale of notes; (2) federal securities law violations; (3) gross negligence in failing "to supervise, control and monitor" the activities of HBS and CHB; (4) defamation in making false accusations against plaintiffs in a criminal complaint issued in Switzerland against certain employees of HBS; (5) issuance of false financial statements in violation of the General Business Law of New York State; (6) securities fraud in violation of the General Business Law of New York State; and (7) "wilful, wanton, malicious and unlawful" behavior on the part of defendants justifying punitive damages.[3]

The amended complaint of the Fidenas plaintiffs presents 18 causes of action in 59 pages and 171 numbered paragraphs. The first three causes of action are essentially the same as the first three in the original Fidenas complaint. The third, fourth, and fifth causes of action allege breach of contract by HBS and the responsibility of defendants for HBS's breach. The alleged breach concerns HBS's agreements with Sidesco for the purchase of HBS notes and

for the issuance of long–term notes to replace short–term notes already purchased and HBS's warranty of merchantability of the notes. The seventh cause of action corresponds to the original fourth cause of action. The eighth and ninth causes of action elaborate on the seventh, separating the effects on Jurick personally–emotional distress–from the effects on Fidenas and Sidesco–interference with business. The tenth cause of action reiterates the defamation cause of action, adding allegations concerning HBS's petition on March 20, 1978, for reconsideration of a determination by the Zurich District Attorney in the Swiss criminal action. The eleventh and twelfth causes of action elaborate on the tenth, again separating the effects on Jurick personally from the effects on Fidenas and Sidesco. The thirteenth cause of action alleges that the 1978 petition amounted to abuse of process. The fourteenth cause of action (denominated as the "eleventh") adds an allegation of defamation in an affidavit of an HBS executive submitted in an action brought by the Fidenas plaintiffs in 1977 in New York State Supreme Court. The fifteenth cause of action specifies the injury–emotional distress–to Jurick caused by the activities alleged in the fourteenth cause of action. The sixteenth, seventeenth, and eighteenth causes of action correspond to the original fifth, sixth, and seventh.

■ Since defendants never filed an answer in this action, plaintiffs are permitted to amend their complaint "once as a matter of course." Fed.R.Civ.P. 15(a). Furthermore, defendants' motion to dismiss does not terminate plaintiffs' right to amend. *See* 6 Wright & Miller, Federal Practice and Procedure: Civil § 1483 (1971). The tenth through thirteenth causes of action in the amended complaint, however, are based on events that occurred after the filing of the original complaint and, as such, should be denominated supplemental pleadings, rather than amended pleadings, and require

---

**3.** The Bishops complaint, in 15 pages and 41 numbered paragraphs, presents essentially the

same causes of action, except for the omission of the defamation cause of action.

leave of the court.[4] Although the granting or denial of such leave is within the discretion of the district court, leave is generally granted in the absence of some specific reason for denying it. 6 Wright & Miller, Federal Practice and Procedure: Civil § 1510 (1971). Although an argument can be made that these plaintiffs delayed unnecessarily in filing their amended and supplemental complaint, this Court sees little purpose in denying plaintiffs leave to supplement their pleadings, since the new allegations are sufficiently related to the old as to warrant joint consideration, and since no specific prejudice to defendants has been brought to the attention of the Court. Accordingly, plaintiffs' supplemental pleadings will be permitted to stand, and their legal adequacy will be examined along with that of plaintiffs' other claims.

## DOMINATION AND CONTROL

Defendants have moved to dismiss the complaints in the two actions for failure to allege fraud with particularity and for failure to state a claim, in the absence of domination and control of HBS by defendants. Defendants have filed a statement of material facts they allege to be undisputed on the issue of domination and control, pursuant to Rule 9(g) of the General Rules of this district, and they seek partial summary judgment on that issue. (In addition, defendants now move to dismiss the securities claims for lack of subject matter jurisdiction and the defamation claims as time barred. Finally, they seek attorneys' fees and other sanctions against plaintiffs for their pursuit of allegedly frivolous lawsuits.)

Before granting a motion for summary judgment, a court must determine that there are no material factual issues. Fed.R. Civ.P. 56. Nevertheless, a court is not precluded from granting summary judgment by the existence of frivolous or immaterial factual issues. *Williams v. McAllister Brothers Inc.*, 534 F.2d 19 (2d Cir. 1976) (affirming district court's granting of summary judgment); *United States v. Matheson*, 532 F.2d 809, 813 (2d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 185 (1976) (affirming district court's granting of summary judgment); *Keating v. BBDO International, Inc.*, 438 F.Supp. 676 (S.D.N.Y. 1977) (granting summary judgment). In addition to ascertaining that there are no material factual issues, the court must be careful to "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975).[5] With these strict standards in mind, we turn to the question of defendants' domination and control of HBS and the factual issues plaintiffs raise with regard to that question.

In their Rule 9(g) statement, defendants list as undisputed facts that, during the time period covered by the complaints: (1) defendant Honeywell Inc. owned between 81.5% and 88.3% of defendant HISI, HISI owned 66% of CHB,[6] and CHB owned 100% of HBS; (2) defendants and HBS had no directors or officers in common; (3) defendants did not contribute to the capitalization of HBS; (4) defendants paid none of the salaries or other costs or expenses of HBS; (5) defendants did not describe HBS as a department or division of Honeywell Inc. or HISI in any corporate reports or refer to the responsibilities of HBS as those of defendants; (6) defendants did not use the offices or other property of HBS as their

---

4. Plaintiffs have not asked leave of the Court to file supplemental pleadings. Insisting on a formal application, however, would not be a productive use of the time of the Court or the parties.

5. Courts are particularly reluctant to grant summary judgment where there has been no opportunity for pretrial discovery. *See, e. g., National Life Insurance Co. v. Solomon*, 529 F.2d 59, 61 (2d Cir. 1976) (per curiam). It should be noted that, in the instant actions extensive discovery has been taken on the issue on which summary judgment is sought.

6. In June 1976, HISI's ownership of CHB was reduced to 47%, when it sold part of its interest in the French company. The French company was renamed Compagnie pour l'Informatique CII Honeywell Bull S.A.

own; and (7) all of the formal legal requirements of HBS were observed.

The Fidenas plaintiffs, in their counterstatement pursuant to Rule 9(g), do not controvert defendants' asserted facts of corporate ownership, but assert that those facts are misleading, since "HBS was indisputably a mere branch office of CHB, dominated and controlled by CHB . . . [and] CHB was controlled by defendants." As for the asserted facts in paragraphs 2–5 of defendants' statements, the Fidenas plaintiffs controvert them by asserting that defendants had officers on the board of directors of CHB, made capital contributions to CHB, included officers and employees of CHB in defendants' "Corporate Executive Compensation Plan," and described CHB as a department or division of defendants. The Fidenas plaintiffs controvert paragraph 6 by mentioning defendants' use of HBS offices during an audit of HBS in the spring of 1974 and controvert paragraph 7 by stating that HBS "board meetings were not regularly held and that in one important meeting, . . . the HBS board merely ratified decisions made by CHB concerning HBS." Finally, the Fidenas plaintiffs list several additional asserted facts, which they claim demonstrate that defendants dominated and controlled CHB and, in turn, CHB dominated and controlled HBS.[7]

7. The Fidenas plaintiffs contend that the following are material facts as to which there exist genuine issues to be tried:

A. That HBS and CHB were dominated and controlled by defendants; that HBS was merely a branch of CHB which in turn was controlled and directed by defendants.

1. During the time period covered by the complaint:

a) defendants owned the majority of the issue and outstanding shares of CHB;

b) officers of defendants served on the board of directors of CHB;

c) defendants made substantial contributions to CHB;

d) defendants in their published materials and otherwise, held themselves out to the public as a single integrated world–wide operation, controlled and managed by and from their Minneapolis headquarters;

e) defendants financed domestic operations from funds generated by their foreign operations;

f) CHB and HBS were at all times consolidated subsidiaries of defendants and their sales and profits were included in defendants' sales and profits;

g) defendants issued numerous written corporate policies and procedures governing the conduct of corporate affairs which said policies and procedures were, in the main, applicable to CHB and its subsidiaries;

h) approval by the defendants was required of expenditures over certain level by CHB;

i) defendants procured or aided in the procuring of loans for CHB;

j) defendants engaged in a unified marketing plan, a division of product development and a division of sales territory;

k) there was in existence a "Management Committee" comprised in major part of defendants representatives which also included members from other components of the Information Systems Group including CHB;

l) defendants approved "Long Range Plans" and "Annual Plans" involving CHB;

m) defendants have "foreign Service Employees" serving with CHB, some in high management positions. One such employee, John Giles, was the chief financial officer of CHB and he enjoyed a special relationship with defendants;

n) when it wished to do so, defendants were able to cause the deferral of the payment of a dividend by CHB;

o) defendants subsidiaries report to defendants in U. S. dollars and in accordance with generally accepted accounting principles;

p) Honeywell conducted a financial audit of the affairs of HBS in the spring of 1974 and for that purpose used questionnaires prepared by the Corporate Financial Audit Department which were applicable both domestically and to foreign subsidiaries;

q) although Honeywell Inc.'s fidelity insurance policy covered itself and its subsidiaries, including HBS, it filed an insurance claim in its own name for the fraudulent activities which form the subject of this lawsuit. It settled the insurance claims for $1,500,000, the proceeds of which apparently were remitted to Honeywell, Inc.;

r) defendants conducted an "investigation" of the note fraud beginning in February, 1975, which included sending their chief auditor to Switzerland.

2. During the period covered by the complaint, CHB and HBS, in reality, were one entity:

a) CHB owned 100% of HBS;

b) officers of CHB served on the HBS board;

c) CHB treated HBS as a mere branch sales office;

d) CHB had the power to hire and fire HBS employees;

e) HBS' board met irregularly and was merely a "rubber stamp" for directives;

Plaintiff Bishops, in its counterstatement pursuant to Rule 9(g), controverts only paragraphs 6 and 7 of defendants' Rule 9(g) statement. Bishops's statement does not specify on what basis those paragraphs are controverted, but instead lists the material issues as to which it contends there are genuine issues to be tried: (1) that CHB "was dominated and controlled by defendants so as to be but an instrumentality of defendants and that the corporate fiction separating such entities should be ignored"; (2) that HBS was similarly dominated and controlled by CHB and by defendants; (3) that defendants were "controlling persons" within the meaning of section 20 of the Securities Exchange Act of 1934; (4) that defendants "held themselves out to the public as a single integrated world–wide operation, controlled and managed by and from the Minneapolis headquarters"; and (5) that "CHB and HBS were consolidated subsidiaries of Honeywell and their sales and profits were included in Honeywell's sales and profits." [8]

The claims of both the Fidenas plaintiffs and Bishops, as will be discussed more fully below, are essentially tort claims. To the extent that the acts constituting the alleged torts were performed by Roland Steampfli, an officer of HBS, in Zurich, in order to demonstrate defendants' liability for those acts, plaintiffs in both actions need to show that defendants dominated and controlled Staempfli–or at least HBS–so that the acts of Staempfli–or HBS–may be viewed as the acts of defendants.

■■ The principal theory used for finding one corporation liable for the acts of another is that of piercing the corporate veil. As stated in *Worldwide Carriers, Ltd.* *v. Aris Steamship Co.*, the relevant factors under this theory are:

(a) The parent corporation owns all or most of the capital stock of the subsidiary.

(b) The parent and subsidiary corporations have common directors or officers.

(c) The parent corporation finances the subsidiary.

(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

(e) The subsidiary has grossly inadequate capital.

(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(i) The parent corporation uses the property of the subsidiary as its own.

(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(k) The formal legal requirements of the subsidiary are not observed.

301 F.Supp. 64, 67–68 (S.D.N.Y.1968) (quoting *Taylor v. Standard Gas & Electric Co.*, 96 F.2d 693, 704–05 (10th Cir. 1938) (quoting Powell, Parent and Subsidiary Corporations

---

f) important corporate activities relating to HBS were handled by CHB in Paris;

g) CHB knew about the fraudulent HBS notes in the summer of 1974 and was directly involved in matters pertaining thereto at least from that time forward.

B. During the time period covered by the complaint, defendants at all times were liable as "controlling person" within the meaning of Section 20 of the Securities Exchange Act of 1934.

Counterstatement of Plaintiffs Fidenas A.G. et al. Pursuant to Rule 9(g) at 3–6.

**8.** The first two of Bishops's "material facts" are legal conclusions. The third is also a legal conclusion, but not one that is relevant to the issue of domination and control for purposes of holding one corporation answerable for the torts of its subsidiary. *See* note 18 *infra*. The fourth and fifth points are also assertions made by the Fidenas plaintiffs and will be dealt with in the discussion below.

§§ 5, 6)). This test is generally viewed as a strict one.[9] No one factor is sufficient, but rather a "combination" of factors must be considered. *Id.* at 67. For example, "[o]wnership by parent of all of its subsidiary's stock has been held an insufficient reason in and of itself to disregard distinct corporate entities." *Williams v. McAllister Brothers Inc., supra,* 534 F.2d at 21. *Accord, Berkey v. Third Avenue Railway Co.,* 244 N.Y. 84, 87, 155 N.E. 58, 58 (1926). *See Noto v. CIA Secula di Armanento,* 310 F.Supp. 639 (S.D.N.Y.1970). Similarly, having all officers in common and sharing office space are insufficient for disregard of the "separate personality" of a subsidiary corporation. *Rapid Transit Subway Construction Co. v. City of New York,* 259 N.Y. 472, 488, 182 N.E. 145, 150 (1932). *Accord, Musman v. Modern Deb, Inc.,* 50 A.D.2d 761, 377 N.Y.S.2d 17 (1st Dep't 1975) (per curiam). Moreover, there is a " 'presumption of separateness' afforded to related corporations." *Williams v. McAllister Brothers Inc., supra,* 534 F.2d at 22 (quoting *American Renaissance Lines, Inc. v. Saxis Steamship Co.,* 502 F.2d 674, 677 (2d Cir. 1974)). In order to overcome the presumption of separateness, what must be shown is that the parent is the "alter ego" of the subsidiary and that the subsidiary is the "mere instrumentality" of the parent. *See Fisser v. International Bank,* 282 F.2d 231, 234 (2d Cir. 1960); *Worldwide Carriers, supra,* 301 F.Supp. at 67.

█ As is readily apparent, defendants' Rule 9(g) statement closely tracks the list of relevant factors from *Worldwide Carriers, supra,* and essentially denies the existence of each of those factors in the relationship between defendants and HBS. The only one of defendants' asserted facts that is directly controverted by either counterstatement is that in defendants' paragraph 6. The Fidenas plaintiffs assert that defendants' denial that they used HBS offices or other property as their own is controverted by defendants' use of HBS offices

during a 1974 audit of HBS. Such a use of office space for a relatively short period of time [10] for a specific purpose hardly seems to fit the broad language of "uses the property of the subsidiary as its own." Moreover, that is only one factor among many and, as such, is insufficient to warrant disregarding the separateness of corporate entities.

Both the Fidenas plaintiffs and Bishops, however, fall back on their "control link" theory. They argue, in essence, that CHB is the "control link" between defendants and HBS; that is, since defendants dominated and controlled CHB and CHB dominated and controlled HBS, defendants dominated and controlled HBS (which employed Staempfli). Paragraphs 2–5 of the Fidenas plaintiffs' counterstatement and many of the asserted facts appended to the counterstatement concern the relationship between defendants and CHB. *See* note 7 *supra.* Of these asserted facts, several are possibly significant. For example, the Fidenas plaintiffs assert that defendants owned a majority of CHB stock. *Id.* Defendants admit that they owned sixty–six percent of the stock. Even one hundred percent ownership, however would not necessarily demonstrate control and domination. *See Williams v. McAllister Brothers Inc., supra,* 534 F.2d at 21. The Fidenas plaintiffs also assert that "officers of defendants served on the board of directors of CHB." *See* note 7 *supra.* The four Honeywell Inc. or HISI officers or employees (none of whom were directors of defendants) who served on CHB's twelve–person board of directors, however, do not seem to represent the kind of domination and control the courts have looked for before allowing the piercing of the corporate veil. *See Lowendahl v. Baltimore & Ohio Railroad Co.,* 247 A.D. 144, 157, 287 N.Y.S. 62, 75 (1st Dep't), *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936) ("the business and officers of the two corporations have become so inextricably confused that it is impossible or impracticable to identify the

---

9. *See* note 15 *infra* for a discussion of cases the Fidenas plaintiffs cite in support of a less stringent test.

10. The audit of HBS took seven weeks and was the first in three years.

corporation that participated in the transaction attacked"). The Fidenas plaintiffs also assert that "defendants have 'foreign Service Employees' serving with CHB, some in high management positions." *See* note 7 *supra*. The apparent significance of this assertion is diminished, however, when it is noted that the Fidenas plaintiffs are talking about approximately 25 employees among CHB's approximately 16,500 employees. Many of the other asserted facts–such as that defendants report their subsidiaries' sales and profits in defendants' sales and profits, defendants approve CHB expenditures over a certain level, defendants procure loans for CHB, defendants and CHB have a unified marketing plan, defendants hold themselves out as a "single integrated world–wide operation," defendants approve CHB's "Long Range Plans" and "Annual Plans," CHB reports to defendants in United States dollars, and defendants have insurance policies covering their subsidiaries, *see* note 7 *supra*–seem to represent fairly common relationships between parent corporations and subsidiaries rather than the "alter ego" or "mere instrumentality" relationship required for piercing the corporate veil. *See Berkey v. Third Avenue Railway Co., supra.*[11] The asserted facts of the Fidenas plaintiffs, even if they are accepted as true, seem insufficient to overcome the presumption of corporate separateness.

Even if this Court were persuaded (which it is not) that the defendants and CHB should be treated as one corporation, there would still be another barrier to be surmounted–the fact that CHB and HBS are separate corporations, one incorporated in France and the other in Switzerland. To demonstrate that these corporate boundaries also should be ignored, the Fidenas plaintiffs assert similar, but more conclusory and less specific, facts.[12] Since the Fidenas plaintiffs' asserted facts, viewed in the most favorable light, are insufficient to justify piercing the corporate veil between defendants and CHB, and since the necessity of leaping over yet another corporate boundary line surely increases substantially the difficulty of plaintiffs' task, this Court sees no purpose to be served in further exploration of this uncharted territory, either in further discovery or at trial.[13]

The Fidenas plaintiffs argue that the tests for piercing the corporate veil are inapplicable, because they are relying on agency analysis rather than that of piercing the corporate veil. The tests for finding agency so as to hold a parent corporation liable for the obligations of its subsidiary, however, are virtually the same as those for piercing the corporate veil. One court has listed as the factors to be considered: "stock ownership, officers and directors, financing, responsibility for day–to–day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets." *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,* 456 F.Supp. 831, 841 (D.Del.1978). Moreover, the courts are careful to note that no one factor is sufficient, *id.,* and discuss the agency tests in stringent terms similar to those used for piercing the corporate veil. *See id.* at 841, 845 ("mere agent or instrumentality"; "shell corporation"; "control must be actual, participatory, and total"); *Berkey v. Third Avenue Railway Co., su-*

---

11. In *Berkey,* a plaintiff who was injured through the negligence of the motorman of a street railway company could not reach the parent corporation of the street railway company, even though the parent corporation owned "substantially all the stock of the subsidiary," the parent reported the subsidiary's income in its own consolidated income, members of the two boards of directors were nearly all the same, both companies had the same executive officers, the parent had made loans to the subsidiary, and the cars of the subsidiary were owned by and marked with the name of the parent. 244 N.Y. at 88–89, 155 N.E. at 59.

12. *See* note 7 *supra*.

13. Since the discovery already conducted on the issue of domination and control was primarily domestic, the relationship between CHB and HBS was less thoroughly investigated than that between defendants and HBS. An additional problem relevant to piercing the corporate veil between CHB and HBS is the question of what law would apply.

pra;[14] Restatement (Second) of Agency § 14M, Comment a & Reporter's Notes (1958).[15] CHB can no more be seen as a "shell corporation" than as a "mere instrumentality" of defendants.

## PLAINTIFFS' THEORIES

### Common Law Fraud

Both the Fidenas plaintiffs and Bishops assert that defendants are liable for Staempfli's issuance and sale of fraudulent promissory notes of HBS. Their argument that defendants should be found liable for the acts of HBS (primarily those acts performed by Staempfli) on the basis of their domination and control of HBS fails because this Court concludes that defendants did not sufficiently dominate and control HBS. Plaintiffs in both actions have also alleged, however, that defendants participated in the fraud directly and thus can be found liable on the basis of their own acts.

The original Fidenas complaint, in paragraph 12, alleges that

defendants, acting individually and/or through and in concert with HBS, and in HBS' name, issued or caused to be issued a series of bills in exchange or notes ("notes"), and fraudulently induced plaintiffs to purchase and/or arrange for the sale of the notes . . . as part of a fraudulent plan or scheme to raise funds among other things, for improper and illegal purposes.

The Bishops complaint, in paragraph 10, alleges that

Honeywell, acting individually and/or through and in concert with HBS and in HBS's name, . . . issued or caused to be issued a series of bills of exchange or notes . . . [and] . . . acting by and through Staempfli induced plaintiff's predecessor, Bishops Bank and Trust Company ‧ Ltd., to purchase said Notes . . . [and] . . . acting through Staempfli, prepared and presented to plaintiff's predecessor, Bishops Bank and Trust Company Ltd., financial and corporate data of HBS, including a statement of HBS's affiliation with Honeywell and the discount rate then being afforded to drafts issued by Honeywell.

Nowhere do these complaints say specifically what defendants, as opposed to Staempfli or HBS, did with regard to the issuance or sale of the notes.[16] In actuality, most of

---

**14.** The *Berkey* court found the same factors that were insufficient for piercing the corporate veil, *see* note 11 *supra*, also insufficient for agency. 244 N.Y. at 88–89, 155 N.E. at 59.

**15.** The cases the Fidenas plaintiffs cite in support of a less stringent test concern finding an agency relationship not for the purpose of imputing vicarious liability, but rather for the purpose of finding sufficient connection with a district or a state to support venue or in personam jurisdiction. *See, e. g., Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 402 F.Supp. 262 (E.D.N.Y.1975); *Taca International Airlines, S.A. v. Rolls–Royce of England, Ltd.*, 15 N.Y.2d 97, 204 N.E.2d 329, 256 N.Y.S.2d 129 (1965). Finding agency sufficient to validate service of process is a different matter from finding agency sufficient for imputing tort liability, just as piercing the corporate veil for finding personal jurisdiction is very different from piercing the veil for finding liability for damages. *See Comprehensive Sports Planning, Inc. v. Pleasant Valley Country Club*, 73 ‧ Misc.2d 477, 341 N.Y.S.2d 914 (Civ.Ct.N.Y. 1973). *See also Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 538, 227 N.E.2d 851, 854, 281 N.Y.S.2d 41, 45, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967).

Moreover, even the tests in the cases cited by the Fidenas plaintiffs are very strict ones, which this Court believes are not met here. For example, in *Taca, supra,* the following facts—none of which are present in the instant actions—were among those the court cited to support its finding of jurisdiction: directors in common, executives from the parent company running the subsidiary, frequent conferences of the executives of the parent and the executives of the subsidiary, *etc.* 15 N.Y.2d at 101, 204 N.E.2d at 330, 256 N.Y.S.2d at 131.

**16.** Bishops alleges in paragraph 14 of its complaint that "defendants provided plaintiff with" confirmation letters as to such matters as the corporate authority of Staempfli to execute and deliver the notes. Bishops does not say who at Honeywell or HISI provided those letters, however. Nor does it elaborate in any way on that vague assertion. It seems likely that the letters were provided by Staempfli through the Fidenas plaintiffs, since Staempfli was the person at HBS with whom the Fidenas plaintiffs dealt. Similarly, in paragraph 15, Bishops alleges that "defendants" used the 1973 note to retire the 1972 notes, even though it is clear that it was Staempfli who issued the 1973 note.

the allegations are written in the passive voice (*e. g.*, "plaintiffs were advised," "plaintiffs were induced," "the Fidenas Group was requested"); it is clear, however, that Staempfli was the principal actor in those instances.

The only allegations the Fidenas plaintiffs make specifically against defendants, in the context of this cause of action, concern defendants' alleged knowledge of the fraud being perpetrated by Staempfli, *see* paragraph 33, and their alleged conspiring and combining to conceal "the true facts and nature of the transactions by engaging in the misrepresentations, acts and omissions as herein alleged." *See* paragraph 34. Knowledge of fraud, however, is not fraud. Nor is mere silence. Fraudulent concealment requires knowledge, a relationship between the parties that creates a duty to disclose, and intent to deceive and defraud by nondisclosure. 24 N.Y.Jur. *Fraud and Deceit* §§ 104–106 (1962). No such relationship is alleged here. Nor is intent alleged, except in very general terms. More important, even though these allegations are made specifically against defendants, they do not specify who aι Honeywell Inc. or HISI knew about the Swiss fraud, or who at Honeywell Inc. or HISI engaged in what "misrepresentations, acts and omissions," or to whom such misrepresentations were made.

The amended complaint of the Fidenas plaintiffs, in the thirty–three pages devoted to the first cause of action, adds little to the particularity of the allegations against defendants. A few allegations bear mentioning. In paragraph 21, the amended complaint alleges that defendants' consolidated financial statements for 1972 and 1973 were "materially false and misleading" because they "failed to disclose the then outstanding Swiss Honeywell notes and other Swiss Honeywell obligations and losses." The amended complaint finds the requisite knowledge on the part of defendants to provide a duty to disclose by inferring it from a communication of Eric N. Held, president of Bishops' New York representative, to the Northwestern National Bank of Minneapolis, a bank with "a long standing, very close relationship with Honeywell." The Court finds this a rather slender reed on which to base an allegation of fraudulent misrepresentation. Paragraphs 26, 29, 34 and others again allege a failure to disclose on the part of defendants, but do not allege that defendants knew what they failed to disclose. Paragraph 38 alleges that defendants were informed of the fraud in Switzerland by telephone calls in late May of 1974 from Ilse Reich and her brother-in-law to Charles Mersereau, a Honeywell patent attorney, and paragraph 40 alleges that Honeywell corporate policies would have required HBS to inform defendants of the fraud in Switzerland. These allegations, if true, would still show no more than knowledge–not fraud. Paragraph 49 alleges that defendants must have known of Staempfli's investments in an oil and gas project in Texas with the money received for the notes, since someone in the oil and gas company received a call from an unnamed person in the Atlanta, Georgia, office of Honeywell. This allegation does not even qualify as "a slender reed."

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity." The allegations in these complaints contrast sharply with this requirement, as stated in *Todd v. Oppenheimer & Co.*:

> In summary, . . . the plaintiffs must specify: 1) precisely what statements were made, and 2)the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, 3) the content of such statements and the manner in which they misled the plaintiff, and 4) what the defendants "obtained as a consequence of the fraud."

78 F.R.D. 415, 420–21 (S.D.N.Y.1978) (quoting *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1088 (S.D.N.Y.1977)). *See Segal v. Gordon*, 467 F.2d 602 (2d Cir. 1972). Consequently, the Court concludes that these complaints, despite their length

and despite the opportunity to replead taken by the Fidenas plaintiffs, fail to allege acts constituting fraud on the part of defendants against these plaintiffs with sufficient particularity to satisfy Rule 9(b).

Ordinarily, plaintiffs in such a situation would be given an opportunity to replead. Both the Fidenas plaintiffs and Bishops, however, have submitted detailed complaints, and the Fidenas plaintiffs have submitted an even more detailed and lengthy amended and supplemental complaint. Thus, this Court has already received three complaints based on essentially the same alleged facts. Given the time and effort on the part of several New York law firms already expended in drafting these complaints, this Court concludes that the problem is not in the pleading, but in the cause of action. No purpose would be served by inviting additional amended complaints.

*Federal Securities Fraud*

■ Both the Fidenas plaintiffs and Bishops have asserted causes of action under the antifraud provisions of the federal securities laws. Defendants have moved to dismiss those claims for lack of subject matter jurisdiction. This Court concludes that it lacks jurisdiction over these claims.

The United States Court of Appeals for the Second Circuit has already decided in a related case that a United States district court has no jurisdiction over the activities that form the subject matter of the securities claims in these actions. *See Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.*, 606 F.2d 5 (2d Cir. 1979), *aff'g* No. 78–545 (S.D.N.Y. Aug. 14, 1978). Plaintiffs in the instant actions argue that the decision of the Second Circuit is not controlling because these actions involve different parties—different defendants in both actions, and a different plaintiff in the Bishops action. The decision of the Second Circuit, however, was based on its conclusion that the "*transactions* alleged are 'on any view' transactions that are 'predominantly foreign.'" *Id.* at 10 (emphasis added). Faced with the same transactions, this Court agrees that they are "on any view ... predominantly foreign" and finds no reason in the change of parties to reach a conclusion different from that of the Second Circuit on the question of subject matter jurisdiction under the securities laws.

In cases involving transnational fraud, subject matter jurisdiction under the securities laws has been based either on acts performed in the United States or on the effects within the United States resulting from conduct outside the United States. *See* Note, *American Adjudication of Transnational Securities Fraud*, 89 Harv.L.Rev. 553 (1976). Most of the Second Circuit decisions finding subject matter jurisdiction in transnational situations have relied on conduct within the United States. *See IIT v. Cornfeld*, 619 F.2d 909 (2d Cir. 1980); *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975) (with regard to foreign plaintiffs and American plaintiffs residing abroad, but not with regard to American plaintiffs residing in the United States); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972). The court in *Bersch, supra*, noted that activities in the United States that "are merely preparatory or take the form of culpable nonfeasance and are relatively small in comparison to those abroad" would not confer subject matter jurisdiction "with respect to foreign plaintiffs." 519 F.2d at 987. Similarly, the court in *Vencap, supra*, decided the same day as *Bersch*, stated: "Our ruling on this basis of jurisdiction [that of activity within the United States] is limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in foreign countries, such as in *Bersch*." 519 F.2d at 1018.

In *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir.), *rev'd with respect to holding on merits*, 405 F.2d 215 (2d Cir. 1968) (en

banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), in finding subject matter jurisdiction, the court relied on the effects within the United States of a sale of stock in Canada, and in *Bersch, supra*, the Second Circuit relied on effects within the United States with regard to American plaintiffs residing in the United States. In both of those cases, the Second Circuit stressed that the effects must be specific, not general—for example, where the transactions concerned a stock listed and registered on a United States securities exchange and American investors in that stock were injured. *See Bersch, supra*, 519 F.2d at 988–89; *Schoenbaum, supra*, 405 F.2d at 208. In addition, the effect must be "substantial." *Vencap, supra*, 519 F.2d at 1017.

In *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A., supra*, the Second Circuit applied both of these theories to the transactions involved in the instant actions and found subject matter jurisdiction lacking. This Court sees no reason to find otherwise. Under neither of these theories does the outcome turn on the nature of the defendant. To the extent that the outcome under the effects theory may turn in part on the type of plaintiff, the crucial question is whether the plaintiff is American or foreign. The plaintiffs in the Fidenas action are the very same foreign plaintiffs as in *Fidenas AG v. Compagnie · Internationale Pour L'Informatique CII Honeywell Bull S.A., supra*, and the plaintiff in the Bishops action is also a foreign corporation. Thus, the nature of the parties in these actions

does not suggest the need for a different result from that already reached by the district court and the Second Circuit in the earlier related case. Relying on the Second Circuit's ruling and on the independent observations (1) that the United States activities here alleged were no more than the "nonfeasance" excluded by *Bersch, supra*,[17] and (2) that the United States effects alleged were not substantial enough to support jurisdiction, this Court finds no subject matter jurisdiction over the securities claims in these actions under the traditional theories.

A third theory that might justify the extraterritorial application of United States statutes rests on the "power of the United States to impose rules on the conduct of its nationals." *Bersch, supra*, 519 F.2d at 985 (citing Restatement (Second) of the Foreign Relations Law of the United States § 30 (1965)). This theory obviously does turn on whether the defendant in an action is a United States national. This theory, however, has been found insufficient as a basis of jurisdiction under the securities statutes, at least in this circuit. *See Vencap, supra*, 519 F.2d at 1016; *see also Bersch, supra*, 519 F.2d at 985, 989 n. 35. Moreover, even if the third theory were applicable to subject matter jurisdiction under the securities statutes, plaintiffs in these actions would have to show that the acts abroad that constituted the fraud were the acts of defendants. This Court has ruled today (*see* discussion on domination and control, *supra*) that plaintiffs have not made that showing.[18]

---

**17.** This Court disagrees with the contention of the Fidenas plaintiffs (*see* Memorandum in Opposition to Defendants' Motion To Dismiss the Amended Complaint at 11–16) that the Second Circuit's recent decision in *IIT v. Cornfeld, supra*, supports a finding of subject matter jurisdiction over the instant securities claims. In *Cornfeld*, where the Second Circuit based its finding of jurisdiction on United States activities, there were many more acts in the United States related to the fraud. For example, the underwriting of the offering was primarily in the United States, the prospectus was wholly drafted and printed in the United States, and the accounting work was done in the United

States. 619 F.2d at 620. In addition, in *Cornfeld*, the foreign subsidiary through which the securities in question were issued, unlike CHB and HBS, was a shell corporation with "no operating assets," whose debentures were guaranteed by its American parent and convertible into the common stock of its American parent. *Id.* at 619–20.

**18.** The argument made by both the Fidenas plaintiffs and Bishops that defendants are "controlling persons" under section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a), is irrelevant because the terms of that section make clear that a court must first find subject matter jurisdiction under the securities

*Remaining Causes of Action*

Most of the remaining causes of action alleged in the original Fidenas complaint and the Bishops complaint fail for some of the reasons already discussed in connection with the common law fraud and federal securities law claims. A few additional issues require brief mention.

The allegations in the original Fidenas complaint and the Bishops complaint charging gross negligence on the part of defendants for failure to supervise HBS depend on the existence of a duty to supervise, which in turn depends on a finding of domination and control. Thus, those causes of action may be dismissed.

The defamation claim in the original Fidenas complaint arises out of allegedly false accusations against plaintiffs in a criminal complaint issued against Staempfli and others in Switzerland in February 1975. The criminal complaint filed by HBS with the Swiss authorities had named as "accused" several persons including Jurick, apparently suggesting that Jurick was involved with Staempfli in the fraud. Jurick was investigated by the Zurich District Attorney, but his name was removed from the list of "accused" in March 1978. This claim seems trifling, since plaintiffs do not include in their papers the allegedly injurious statements. Moreover, this claim, like the negligence claim, seems to depend on the domination and control issue, since the complaint fails to specify what defendants, as opposed to HBS, did.

■ In addition, the claim is barred by the one–year statute of limitations in New York State for defamation, N.Y.Civ. Prac.Law & R. § 215(3) (McKinney 1972), since the Fidenas plaintiffs did not file their complaint until September 1977, two and one–half years after the filing of the allegedly defamatory criminal complaint. The Fidenas plaintiffs' attempt to describe this cause of action as prima facie tort, which is subject to three–year limitation, N.Y.Civ.Prac.Law & R. § 214(4) (McKinney Supp.1979), is unpersuasive.[19] The Fidenas plaintiffs allege in paragraphs 65 and 70 that the criminal complaint "accused them of acting in bad faith in the sale of said notes, of being an accessory to criminal activity, and brought into disrepute their respective character and business integrity," resulting in damage to plaintiffs' business and to "their reputation and credibility in the financial and business community." This is injury to reputation, which is defamation and, as such, is subject to New York's one–year statute.[20] *See Korry v. International Telephone and Telegraph Corp.*, 444 F.Supp. 193, 195 (S.D.N.Y.1978); *Morrison v. National Broadcasting Co.*, 19 N.Y.2d 453, 227 N.E.2d 572, 280 N.Y.S.2d 641 (1967). The Fidenas plaintiffs' argument that the New York statute of limitations does not apply at all because of a waiver of the statute is equally unavailing. Since the waiver admittedly was made by HBS, *see* Affidavit of Dr. Albert P. Gnaegi, ¶ 12, it would not be binding on defendants unless HBS and defendants were found to be the same person or in an agency relationship. Indeed, the Fidenas plaintiffs admit that the applicability of the waiver depends on the domination and control question. *See* Letter from Peter K. Leisure to the Court (May 5, 1980). That question has been answered in the negative.

The two causes of action based on alleged violations of state securities laws, found in both original complaints, must be dismissed

---

laws before it confronts the issue of whether *another* person "controls any person liable under any provision of this chapter . . . ."

**19.** In addition, these allegations would not satisfy other requirements of a prima facie tort cause of action, such as special damages, *see Keating v. BBDO International, Inc., supra*, 438 F.Supp. at 683, and desire to injure these plaintiffs as the sole motive of defendants. *Korry v. International Telephone and Telegraph Corp.*,

444 F.Supp. 193, 195 (S.D.N.Y.1978). *See* paragraph 68, in which the selfish motive of diverting attention from "defendants' own improper conduct" is alleged.

**20.** Interestingly, the Fidenas plaintiffs characterize the same cause of action in their amended complaint as "defamation." (*See* Memorandum in Opposition to Defendants' Motion To Dismiss the Amended Complaint at 5).

because they are fraud claims, *see* N.Y.Gen. Bus.Law §§ 339–a, 352–c (McKinney 1968); *Superintendent of Insurance v. Freedman*, 443 F.Supp. 628, 637 (S.D.N.Y.1977), *aff'd*, 594 F.2d 852 (2d Cir. 1978), and, like common law fraud and federal securities fraud, must be pleaded with particularity in order to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. *Clinton Hudson & Sons v. Lehigh Valley Cooperative Farms, Inc.*, 73 F.R.D. 420, 428 (E.D.Pa.1977), *aff'd*, 586 F.2d 834 (3d Cir. 1978).

Finally, both original complaints allege causes of action based on "wilful, wanton, malicious and unlawful" activities. Of necessity, these claims fall with the others.

There remain only the additional causes of action presented by the amended complaint of the Fidenas plaintiffs. The breach of contract claims alleged in the third, fourth, and fifth causes of action in the amended complaint, again, depend on a showing of domination and control, since the agreements and the warranty at issue were between HBS and plaintiff Sidesco. The eighth through fifteenth causes of action, insofar as they are variations of the original defamation cause of action (which is repeated in the amended complaint as the seventh cause of action), are, like the original defamation claim, barred by the statute of limitations. Although the tenth and fourteenth causes of action include new references to allegedly defamatory statements made in 1977 and 1978, more than one year elapsed between them and the filing of the amended complaint in 1980. These claims are also pleaded, however, in terms of intentional infliction of emotional distress, interference with advantageous economic relations, and abuse of process. The attempts to attach new labels to the same set of alleged facts that constitute defamation causes of action are not persuasive. The injury complained of remains essentially damage to reputation, which is defamation. *See Korry v. International Telephone and Telegraph Corp.*, *supra*, 444 F.Supp. at 195; *Morrison v. National Broadcasting Co.*, *supra*, 19 N.Y.2d at 458, 227 N.E.2d at 574, 280 N.Y.S.2d at 644. Moreover, in the context of intense litigation on both sides of

the Atlantic Ocean in which the acts complained of allegedly occurred, these acts appear very far from the outrageous conduct required to support a cause of action for intentional infliction of emotional distress. *See Alexander v. Unification Church of America*, 634 F.2d 673 (2d Cir. 1980); *Fischer v. Maloney*, 43 N.Y.2d 553, 373 N.E.2d 1215, 402 N.Y.S.2d 991 (1978); *Clark v. New York Telephone Co.*, 52 A.D.2d 1030, 384 N.Y.S.2d 562, 564 (4th Dep't 1976), *aff'd*, 41 N.Y.2d 1069, 364 N.E.2d 841, 396 N.Y.S.2d 177 (1977). For example, it seems inappropriate for plaintiff Jurick to complain of statements made by defendants in an attempt to defend themselves in an action brought in New York State Supreme Court by Jurick and his companies, plaintiffs Fidenas and Sidesco.

## COSTS AND FEES

The claims of the Fidenas plaintiffs and Bishops are weak. The standard for awarding costs and attorneys' fees to the prevailing party, however, is a strict one, requiring a finding of bad faith in bringing or prosecuting an action. *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). "Bad faith" has been defined as bringing a claim that is "entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir. 1977). An action's lack of merit has been found insufficient in itself to constitute "bad faith." *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18, 21 (2d Cir. 1980) (citing *Runyon v. McCrary*, 427 U.S. 160, 183–84, 96 S.Ct. 2586, 2600–01, 49 L.Ed.2d 415 (1976)). This Court concludes that this standard has not been reached in these actions. Thus, no award of costs or attorneys' fees is warranted.

## SUMMARY

Defendants' motion for summary judgment in their favor on the issue of domina-

tion and control is granted. For the reasons stated, the original complaints of the Fidenas plaintiffs and Bishops and the amended complaint of the Fidenas plaintiffs are dismissed. No costs (other than statutory costs) or attorneys' fees are awarded.

SO ORDERED.